608

## IN THE MATTER OF A SUBMISSION ON AGREED FACTS IN A CONTROVERSY BETWEEN E. FAXON BISHOP, ET AL., AND J. H. MAHIKO, ET AL.

### No. 2106.

SUBMITTED JULY 9, 1940.                    DECIDED SEPTEMBER 6, 1940.

COKE, C. J., PETERS, J., AND CIRCUIT JUDGE LE BARON IN PLACE OF KEMP, J., DISQUALIFIED.

610

612

614

OPINION OF THE COURT BY PETERS, J.

This is an original submission upon an agreed statement of facts filed pursuant to the provisions of R. L. H. 1935, §§ 3616 to 3619, both inclusive.

The trustees under the will and of the estate of Bernice P. Bishop, deceased, hereinafter called "the trustees," appear both for themselves and for the tenants of the ahupuaa of Makalawena who had been such prior to the

year 1900. J. H. Mahiko (k) and Ane Una (w), two of such tenants, are parties and appear both personally and on behalf of all other tenants of said ahupuaa similarly situated. They will be hereinafter referred to as "the tenants."

The agreed statement is too voluminous to permit its quotation. References to relevant and material facts contained therein will be made where appropriate to the subject discussed.

Much of its contents is immaterial. The history of ancient Hawaiian land tenure need not be considered further than it may serve to define and explain the words and phrases found in the laws of the Republic of Hawaii, pertaining to private fisheries existing immediately prior to the effective date of the Hawaiian Organic Act. Of the meaning of Hawaiian words, this court takes judicial notice.[1] Nor are we concerned with the respective rights of piscary enjoyed by konohikis and common people in ancient times, except as the statutes defining private fisheries may require construction. Since the year 1839, those rights have been regulated and defined by written laws.[2]

The submission is replete with conclusions of law. These will not be considered. Likewise the construction placed by the parties upon local statutes quoted or referred to shall be disregarded further than they may be accepted by the court as admissions. For the purposes of the record there is filed herewith an expurgated statement prepared by the court incorporating the agreed facts as considered by the court with our rulings upon the parts expunged.

The submission is defective in failing to set forth in concrete form the "questions in difference" between the parties as the term "question in difference" is used and

---

[1] *Brown* v. *Spreckels*, 14 Haw. 399, 403.

[2] *Levi Haalelea* v. *Daniel Montgomery*, 2 Haw. 62, 65.

employed in section 3616 and, despite the order of this court made after submission requesting the parties, by amendment of the agreed statement of facts or otherwise, to state in concrete form the questions in difference between them, the parties persisted in merely stating their respective contentions. The distinction between "a question in difference" "which might be the subject of the civil action," as the former term is employed in section 3616 and the "contentions" of the parties creating the "question in difference," is obvious. Forms as precedents are not lacking.[3]

---

[3] *Green and Hackfeld, assignees of Waterhouse,* v. *Janion, Green & Co.,* 2 Haw. 428; *Joseph Ellis* v. *A. White,* 3 Haw. 205; *Kaluahine* v. *S. B. Dole, Trustee,* 3 Haw. 374; *F. H. Harris, assignee,* v. *A. F. Judd, administrator,* 3 Haw. 421; *Robert Sterling, Minister of Finance,* v. *H. R. Hollister,* 3 Haw. 486; *W. C. Parke and Mark Robinson* v. *S. L. Austin,* 3 Haw. 586; *D. Foster & Co.* v. *Thomas Spencer,* 3 Haw. 594; *S. Spencer* v. *C. S. Bartow, et al.,* 3 Haw. 719; *Raymond, et al.,* v. *Dole, et al., Assignees,* 4 Haw. 232; *S. E. Bishop et al.,* v. *C. H. Judd, Assessor,* 4 Haw. 29; *The Minister of the Interior* v. *John S. McGrew,* 4 Haw. 472; *Hopper* v. *Parke,* 7 Haw. 185; *Black* v. *Castle,* 7 Haw. 273; *Kekaha Sugar Co.* v. *Hawn. Govt.,* 8 Haw. 293; *Hutchinson Sugar Co.* v. *Hawn. Govt.,* 8 Haw. 308; *Thurston* v. *Allen,* 8 Haw. 392; *Hilo Sugar Co.* v. *Tucker,* 8 Haw. 148; *Iuko* v. *Holt,* 9 Haw. 88; *Wundenberg* v. *Campbell,* 9 Haw. 203; *In Re Estate of Wilder,* 9 Haw. 492; *Mouritz* v. *Lewis,* 12 Haw. 19; *Buckley* v. *Monsarrat,* 12 Haw. 265; *Lansing* v. *Theo. H. Davies & Co.,* 13 Haw. 286; *Kellett* v. *Damon,* 13 Haw. 423; *Grace* v. *Territory of Hawaii,* 13 Haw. 465; *Oahu R. & L. Co.* v. *Pratt,* 14 Haw. 126; *Grace & Irwin* v. *Carl S. Smith,* 14 Haw. 144; *Harris* v. *Cooper,* 14 Haw. 145; *Mossman* v. *Dole,* 14 Haw. 365; *Walker* v. *Bickerton,* 14 Haw. 492; *Oahu Railway Co.* v. *Ewa Plantation Co.,* 15 Haw. 318; *Pratt* v. *Holloway,* 17 Haw. 539; *Fitchie* v. *Brown,* 18 Haw. 52; *Trustees Ena Estate* v. *Maria K. Ena,* 18 Haw. 588; *Atherton* v. *Campbell,* 19 Haw. 340; *Wilder* v. *Lucas,* 19 Haw. 350; *Simerson* v. *Simerson,* 20 Haw. 57; *Richards* v. *Ontai,* 20 Haw. 335; *Wilder* v. *Hawaiian Trust Co.,* 20 Haw. 589; *Honolulu Rapid Transit & Land Co.* v. *Territory,* 21 Haw. 136; *Apokaa Sugar Co.* v. *Wilder,* 21 Haw. 571; *Santo Antonio Society* v. *Rodrigues,* 22 Haw. 4; *Kamahu* v. *Bicknell,* 22 Haw. 209; *Paiko* v. *Boeynaems,* 22 Haw. 233; *Brede* v. *First Nat. Bank,* 23 Haw. 537; *Naopala* v. *Hina,* 24 Haw. 341; *Frear* v. *Wilder,*

The court must confess to doubt as to the form of
civil action available to the trustees and tenants or either
of them against the Territory of Hawaii under the facts
of the agreed statement and the provisions of the statute
permitting suits against the Territory.[4] The agreed state-
ment is silent as to the form of the judgment or decree
that may be entered herein pursuant to the opinion of the
court. It is conceivable, however, that there is available
to the Territory of Hawaii, under the stipulated facts,
civil actions either at law or in equity, the ultimate effect
of which would be to determine the state of the title of
the fishery of Makalawena. We have examined and
analyzed the respective contentions made by the parties
and have concluded that there are but three questions in
difference between them which may be the "subject of a
civil action" as that term is employed in section 3616,
*viz*: (a) whether the trustees and tenants, to the extent
of their respective rights in the fishery of Makalawena, as
defined by the laws of the Republic of Hawaii pertaining
to private fisheries as they existed immediately prior to
the effective date of the Hawaiian Organic Act, are the
owners of the fishery of Makalawena, or (b) whether the
said fishery is the sole property of the United States for
the use and benefit of citizens of the United States, the
solution of both of which depends solely upon the further
question (c) whether the provisions of section 95 of the
Hawaiian Organic Act providing that "no * * * vested
right [in the fisheries in the sea waters in the Territory
of Hawaii not included in any fish pond or artificial
enclosure] shall be valid after three years from the taking

---

25 Haw. 603; *Foster* v. *Waiahole Water Co.*, 25 Haw. 726; *Pedro, Jr.*,
v. *Hapai*, 28 Haw. 744; *Estate of Deering*, 29 Haw. 854; *Ai* v. *Bailey*,
30 Haw. 210; *Estate of Deering*, 30 Haw. 217; *von Hamm-Young* v.
*Long*, 30 Haw. 260.

[4] R. L. H. 1935, § 4420.

effect of this Act unless established as hereinafter provided" and of section 96 of said Act requiring that "any person who claims a private right to any such fishery shall, within two years after the taking effect of this Act, file his petition in the circuit court of the Territory of Hawaii, setting forth his claim to such fishing right, service of which petition shall be made upon the attorney-general, who shall conduct the case for the Territory, and such case shall be conducted as an ordinary action at law," are violative of the provisions of article V of the amendments of the Constitution of the United States, inhibiting the deprivation of property without due process of law and the taking of private property for public use without just compensation.

Moreover, there is a paucity of facts upon which the question of "due process" necessarily depends. The effect of this deficiency is discussed in connection with the subject of burden of proof of unconstitutionality.

After submission,[5] upon first impression it was assumed that historical facts, including official records of public offices of which the court could take judicial notice, could be resorted to for the purpose of supplementing the deficiencies of the agreed statement. Ordinarily, courts of the Territory take judicial notice of the principal facts of Hawaiian history.[6] Federal precedent exists for its exercise.[7] But the case being before the court upon a statutory submission upon an agreed statement, doubt arose as to the propriety of our so doing. Hence, in an abundance of caution and in order to give counsel an opportunity to be heard, the court requested the parties

---

[5] The case was submitted without argument upon the briefs.

[6] *In re title of Pa Pelekane*, 21 Haw. 175, 187; *Lowrey* v. *Territory of Hawaii*, 19 Haw. 123, 125.

[7] *United States* v. *Reynes*, 9 How. 127, 146 (U. S.) ; *United States* v. *Teschmaker et al.*, 22 How. 392, 405 (U. S.).

to file supplemental briefs upon the question: "To what extent, if any, may the court supplement the agreed statement of facts with historical facts of which it may take judicial notice, including official records of the Republic, Provisional Government and Kingdom of Hawaii, kept in the Archives and in the offices of the Land Commissioner and of the Government Surveyor?" In 1905, there was created a board of commissioners of public archives whose duty it was to collect all public archives, to arrange, classify and inventory the same, to provide for their safekeeping and to compile and furnish information concerning the same.[8] In 1921, the board of regents of the University of Hawaii was authorized to secure the compilation from all available sources and to publish a revised history of the Hawaiian people; to employ such competent persons as were necessary for the compilation of the volume and to purchase the necessary documents, records and materials for use in such compilation, such documents, records and materials so secured to be deposited in the territorial archives after their use by the board.[9] The Hawaiian Organic Act created the office of commissioner of public lands[10] to whom was committed the custody, control and safekeeping of all of the former records of the minister of the interior,[11] agent of public lands and commissioner of public lands. Upon the passage of the Hawaiian Organic Act, the office of surveyor general was abolished and that of "surveyor" substituted, in and upon whom was reposed and imposed all of the powers and duties theretofore attached to the surveyor general, except such as related to

---

[8] See Haw. Laws 1905, c. XXIV, R. L. H. 1935, §§ 40, 41.

[9] Haw. Laws 1921, c. 120, amended Haw. Laws 1923, c. 139, amended Haw. Laws 1932 (2d) c. 9, R. L. H. 1935, § 834.

[10] Hawaiian Organic Act § 73.

[11] For records formerly in the custody of minister of the interior, see note 91.

the geodetic survey of the Hawaiian Islands.[12]  In response
to the request of the court, the parties took the unqualified
position[13] that in a statutory submission upon an agreed
statement· of facts, this court was without authority to
take judicial notice of historical facts, including the public
records of the offices referred to.  Counsel for the trustees
and tenants rely upon the case of *Walton* v. *Stafford*,
43 N. Y. S. 1049, as authority for the claim that upon a
submission of a controversy under an agreed statement
of facts the court is not authorized to consider a fact which
might be judicially noticed.  We do not consider that the
*Walton* case goes any further than holding that where,
in a submission upon an agreed statement of facts sub-
mitted to the court *nisi*, it was agreed that an obligation
accrued on the first day of January, the appellate division
on review would not take judicial notice of the fact that
the first day of January fell on a Sunday and as a con-
sequence the obligation accrued on the next day, Monday,
January 2.  The court expressly rests its opinion upon
the failure of the defendants to call this fact to the atten-
tion of the court upon the trial and their failure to request
the court to take judicial notice of the fact suggested for
the first time on appeal.  Implicit in the opinion is the
dictum that while it was not a fact which the defendants
were bound to prove in the ordinary way, nonetheless it
was a fact which they were required, if they desired its
consideration, to place in some way before the trial court.
(p. 1051.)  Both the attorneys for the trustees and tenants
and the attorney general take the position that facts of
which the court might take judicial notice are analogous
to inferences of fact; that inferences of fact may not be

---

[12] Hawaiian Organic Act § 78.

[13] The trustees in their opening brief took the opposite position.
(Opening brief of trustees and tenants, pp. 77, 172.)

drawn from the facts contained in the submission and that hence, upon a statutory submission, facts of which the court may take judicial notice are excluded.

Hawaiian precedent indicates that upon a statutory submission the agreed facts may be supplemented and explained by facts of which the court may take judicial notice not inconsistent nor in conflict with the admitted facts. In the case of *Estate of His Majesty Kamehameha IV.*, 2 Haw. 715, 718, one of the questions presented involved the construction of the Act of June 7, 1848, entitled "An Act relating to the lands of his Majesty the King, and of the Government." It was there conceded that the court, in order to enable it to give a just construction to the Act, was at liberty to refer not only to the two instruments executed by His Majesty, Kamehameha III, on the 8th of March, 1848, which were unquestionably the foundation of the legislative enactment, but "also to Hawaiian history, custom, legislation and polity, as well as to the records of the Privy Council, and the acts of the parties immediately interested subsequent to the great division." In *Rapid Transit Co.* v. *Tram. Co.*, 13 Haw. 363, one of the questions presented was whether the defendant company, under the law of its creation, had a right to operate its railway by electricity. The court took judicial knowledge of the fact that in 1884, the time of the passage of the Act under which the Tramways Company was incorporated, electricity had not been brought into general use as a motor power. (p. 372.) In the same case, in connection with another question presented, *viz.*, whether the plaintiff transit company, under the law of its creation, had the right to lay a track on King street for more than 1700 feet, the court observed that it was "now a matter of common knowledge that some of the streets enumerated in Section 1 were so narrow that two tracks of railway laid parallel on them would occupy the entire street to

the great annoyance and inconvenience of the public."
(p. 376.) In the case of *Ewa Plantation* v. *Wilder*, 26
Haw. 299, two of the questions propounded for decision
involved the actual time at which losses were sustained by
the taxpayers through the sale by the taxpayers of the
corporate stock and mainland bonds, and the court took
judicial notice that "during the last decade all stocks and
bonds throughout the world have violently fluctuated with
the greatest frequency, often changing in value from time
to time with kaleidoscopic rapidity." (p. 321.)

A marked distinction exists between the respective
evidentiary statuses of inferences of fact and historical
facts, including official records of public offices of which
a court may take judicial notice. An analogy exists, how-
ever, where the submission is silent upon a particular
subject but facts included in the submission admit of the
irrebuttable inference as to the subject upon which the
statement is silent. To the extent that an analogy exists
between inferences of fact and historical facts of which the
court may take judicial notice, this court has drawn in-
ferences of fact from the facts contained in the agreed
statement where the inferences were supplementary to and
explanatory of and not inconsistent nor in conflict with
the admitted facts upon which the submission was based.
In *Hilo Sugar Co.* v. *Minister of Finance*, 7 Haw. 665,
the agreed statement of facts was silent as to ownership by
the taxpayer. The court assumed that the property subject
to taxation was the property of and belonged to the tax-
payer. The court said: "The agreed statement very care-
fully abstain[s] from any declaration as to the ownership
of the sugar. They deny the possession, custody and
control of it. But there is no denial of the ownership by
the plaintiff, and we think the whole case justifies the
assumption that the sugar was the property of and be-
longed to the plaintiff. If it had been sold and delivered

to this vessel for transportation to the purchaser, it was for the plaintiff to so set it forth, and we shall assume that he would have done so if such were the fact." (p. 670.) In *Ewa Plantation* v. *Wilder, supra,* the court said: "It is regrettable that while the submissions contain statements to the effect that the proceeds of the sales of sugar by the mainland agencies of the taxpayers were placed to the general credit of the local companies to be drawn against from time to time as funds were required by them for the payment of their operating expenses, etc., the submissions are silent respecting the disposition and use of the income derived from the mainland investments now in question. In the absence of a showing *to the contrary* [italics ours] we are led to assume that the income received from these mainland securities and bank deposits was dealt with in the same manner as the proceeds from the sales of sugar." (p. 307.) In a statutory submission under the New York Code, from which our statutory provisions for submissions upon agreed statements of fact were adopted, the appellate division of the supreme court of New York took a similar position. In *Knickerbocker Trust Co.* v. *King,* 111 N. Y. S. 192, upon the submission of a controversy involving the rights of persons to a trust fund created by a will, consisting of personal property where there was no evidence that any of it was the proceeds of real estate of the testator and the trustee assumed that the submission was sufficient to authorize the court to decree the distribution of the fund, it was assumed by the court that the fund was the proceeds of personal property.

In our opinion, where, as here, one of the questions submitted in a statutory submission is whether provisions of the Hawaiian Organic Act conferring upon the Territory of Hawaii the power to condemn private fishing rights to the use of the citizens of the United States and prescribing

the procedure to be undertaken in the exercise of the power conferred are violative of the provisions of the fifth amendment of the Constitution of the United States in respect to due process and the taking of private property for public use without just compensation, this court may take judicial notice of historical facts, upon which the agreed statement is silent, including official records of the Republic of Hawaii, Provisional Government and Kingdom of Hawaii, kept in the archives and in the offices of the land commissioner and of the government surveyor, which are supplementary to and explanatory of but not inconsistent nor in conflict with the admitted facts upon which the submission is based. This conclusion does not, however, impose any obligation upon the court to, of its own motion, take judicial notice of "whatever ought to be generally known" or to independently examine the pertinent and material records of public offices to ascertain facts upon which the agreed statement is silent and of which it may take judicial notice. Ordinarily, the duty rests upon the parties to call the attention of the court to matters of which they desire it to take judicial notice and to furnish the proper books or documentary evidence wherewith to refresh the court's recollection.[14] The court shall, therefore, take judicial notice of what it ought to know of the principal facts of Hawaiian history, upon which the submission is silent, not inconsistent or in conflict with the facts contained in the agreed statement, but shall refrain from considering judicially any records of the public offices referred to that have not been called to the attention of the court by counsel.

The trustees and tenants contend in their brief that the sea fishery of Makalawena is appurtenant[15] to or be-

---

[14] *Walton* v. *Stafford*, 43 N. Y. S. 1049, 1052.

[15] Counsel for the trustees and tenants make the reservation that by the word "appurtenant" as used by them in describing the legal relation

longs to the ahupuaa of that name; that despite the failure by their predecessor trustees and by the tenants of the ahupuaa to establish said fishery pursuant to the provisions of sections 95 and 96 of the Hawaiian Organic Act, they still have a vested right in and the title to said fishery; that the present trustees and/or their predecessor trustees and the tenants named in the caption of the agreed statement were in possession of said fishery as trustees and as such tenants prior to the annexation of the Hawaiian Islands to the United States and prior to the passage of the Hawaiian Organic Act; that the ahupuaa was by the mahele set apart to Akahi, aunt of Bernice Pauahi Bishop, and in 1855 she received a land commission award of the same; that in 1884 a royal patent was issued in the name of Akahi and the fishery of Makalawena was included in and conveyed by said patent and described therein by metes and bounds; that title to the ahupuaa and its said fishery passed from Akahi to her niece, Bernice Pauahi Bishop, and from the latter by her will to her trustees and the exclusive actual physical occupancy and possession of the ahupuaa and fishery have been in Akahi, Bernice P. Bishop and the trustees from the date of the award to the present date subject to the rights of the tenants of the ahupuaa and they are still in such occupancy and possession; that the tenants named in the title of the agreed statement were and have been exercising their rights as tenants therein since prior to the effective date of the Hawaiian Organic Act and since prior to annexation; that the trustees and their tenants are still the exclusive owners of this fishery, the trustees having a vested estate in fee simple therein, subject to the rights of their tenants

---

existing between a sea fishery and the ahupuaa to which it belongs, they do not mean that a konohiki sea fishery would necessarily pass by deed which only named the ahupuaa on which the fishery fronted, but merely in the sense that fishery A belonged to land A.

of the ahupuaa of Makalawena as defined by statute; that
sections 95 and 96 of the Hawaiian Organic Act, in so
far as they purport to deprive the trustees and tenants
of their vested rights in the fishery by reason of failure to
adjudicate the same as provided by those sections, are un-
constitutional and void and of no effect; that with regard
to the tenants these sections (sections 95 and 96 of the
Organic Act) do not apply to whatever rights they may
have had but if they do, then they are also unconstitutional
so far as concerns them and their rights. The trustees
"base * * * [their] position on the proposition that a
statute which, without some *public controlling* [italics
theirs] necessity, and for public objects, seeks to deprive a
person of his vested rights of private property, is un-
constitutional." They admit the public object—to open
these private fisheries to the public—but deny the existence
of public controlling necessity or of any necessity for the
enactment of sections 95 and 96 of the Hawaiian Organic
Act. They also contend that section 95 of the Hawaiian
Organic Act is not a statute of limitations and is not
analogous to such a statute and also that it is not in
the nature of a recording Act nor in anywise analogous to
it in view of conditions in Hawaii at the time the Hawaiian
Organic Act was passed; that being neither a recording
nor a limitation statute if *sui generis*, it is nothing more
than an attempt to deprive owners of vested titles in
property of their property without due process of law—
an attempt to take private property without compensation.

In our opinion the agreed submission admits of the
conclusion that immediately prior to the effective date of
the Hawaiian Organic Act[16] (June 14, 1900), the fishing
ground, which by ancient regulation belonged to the ahu-
puaa of Makalawena, was the private property of the then

_____
16 Act of Congress of April 30, 1900; 31 Stat. L., c. 339, p. 141.

trustees under the will and of the estate of Bernice P. Bishop, deceased, the predecessors in title to the trustees, parties to the within submission, subject to the rights of the tenants, J. H. Mahiko and Ane Una, the other parties hereto, and all other tenants[17] of the ahupuaa of Makalawena similarly situated. It is recited in the agreed statement of facts that prior to the mahele of 1848[18] one Akahi, a high chiefess, being konohiki[19] of fifteen ahupuaas and ilis, in the mahele on January 28, 1848, surrendered eight of these to the King and he consented to the retention by her of seven, among the latter of which was included the ahupuaa of Makalawena. The mahele to Akahi contains the endorsement "the lands above written are for Akahi: consent is given to take it before the Board of Commissioners to quiet land titles. KAMEHAMEHA (SEAL)."[20] It is also recited in the agreed statement that upon application by Akahi therefor, there was regularly issued to her by the commission to quiet land titles on, to wit, March 29, 1855, an award of the ahupuaa of Makalawena, num-

---

[17] See note 25.

[18] For examples of divisions in the mahele of 1848, see *Kenoa* v. *Meek*, 6 Haw. 63; *Harris* v. *Carter*, 6 Haw. 195, 198, 199; *Thurston* v. *Bishop*, 7 Haw. 421, 440; for its history and legal incidents see *Estate of His Majesty Kamehameha IV.*, 2 Haw. 715; *Charles Kanaina* v. *Thomas Long*, 3 Haw. 332, 335; *Kenoa* v. *Meek, supra*, 66, 67; *Harris* v. *Carter, supra*, 198; *Thurston* v. *Bishop, supra*, 425, 433, 441; *In re Title of Pa Pelekane*, 21 Haw. 175, 185; *Territory* v. *Gay*, 26 Haw. 382, 398; *Land Title, Waimalu*, 33 Haw. 832, 838.

[19] For meaning of the Hawaiian word "konohiki" see particularly *Levi Haalelea* v. *Daniel Montgomery*, 2 Haw. 62; *Hatton* v. *Piopio*, 6 Haw. 334, 336, 338, and other cases cited under note 22.

[20] Commission created by Act of December 10, 1845. For statutory history of commission to quiet land titles, see: Second Act of Kamehameha III; "An Act to Organize the Executive Departments" of the Government of April 27, 1846, pt. 1, ch. VII, art. IV; Haw. Laws 1846, p. 107; principles adopted by land commission August 20, 1846, and approved by the legislature October 26, 1846, Haw. Laws 1847, p. 81.

bered 5368, apana 3.[21] The award contains a reference to the mahele of Makalawena to the awardee; grants a fee simple title less than the allodial; imposes the condition that if the awardee pays the government's one-third interest, then she will be entitled to a royal patent in fee simple and concludes with the endorsement that the award is issued in accordance with the law of June 19, 1852, concerning konohikis.[22] The award, consistently with the provisions of the Act referred to, does not describe the ahupuaa of Makalawena by metes and bounds and awards the same by name only. It is recited in the agreed statement that the ahupuaa of Makalawena fronted on the sea and that to said ahupuaa there belonged a fishing right. We assume that the fishing right referred to belonged to the ahupuaa of Makalawena, according to ancient custom.

In 1855, and at the time of the issuance by the land commission of the award to Akahi of the ahupuaa of Makalawena, the legal incidents of private fishing rights were defined by statute.[23]

---

[21] For the legal effects of an award by the commission to establish land titles, see: *Kekiekie* v. *Dennis*, 1 Haw. 69; *Kukiiahu* v. *Gill*, 1 Haw. 90, 91; *Kalama* v. *M. Kekuanaoa and John Ii, Guardians of V. Kamamalu*, 2 Haw. 202; *C. R. Bishop* v. *Namakalaa and Kahinukawa*, 2 Haw. 238; *L. Keelikolani* v. *James Robinson*, 2 Haw. 522, 546; *Boundaries of the Ili of Kewalo*, 3 Haw. 9; *Kahoomana* v. *the Minister of the Interior*, 3 Haw. 635, 637; *J. H. Brunz* v. *the Minister of the Interior*, 3 Haw. 783, 785; *His Majesty Kalakaua et al.*, v. *G. W. Keaweamahi, et al.*, 4 Haw. 577; *Kaai* v. *Mahuka*, 5 Haw. 354; *Kenoa* v. *Meek*, 6 Haw. 63; *Thurston* v. *Bishop*, 7 Haw. 421; *Rose* v. *Yoshimura*, 11 Haw. 30, 32; *Atcherley* v. *Lewers & Cooke*, 18 Haw. 625, 635, and cases cited; *In re Title of Pa Pelekane*, 21 Haw. 175; *Kapiolani Estate* v. *Atcherley*, 21 Haw. 441, 446, 460; *Territory* v. *Gay*, 26 Haw. 382.

[22] See Haw. Laws 1852, p. 28, cited and construed in *Boundaries of the Ili of Kewalo*, 3 Haw. 1, 15; *Territory* v. *Gay*, 26 Haw. 382, 400; *In the Matter of the Boundaries of Pulehunui*, 4 Haw. 239; *Henry Cornwell* v. *Board of Education*, 4 Haw. 540, 543; *Re Boundaries of Paunau*, 24 Haw. 546, 554.

[23] Enactment of His Majesty Kamehameha III of June 7, 1839,

The agreed statement declares that "Under the statutes
* * * Republic of Hawaii [as they existed immediately
prior to the effective date of the Hawaiian Organic Act],
the respective rights of the Konohiki and his tenants in
any fishery were as follows: The Konohiki each year was
entitled to designate and set apart for himself, for his
sole and exclusive use within the fishing grounds belonging
to his Ahupuaa or Ili, one given species or variety of fish
natural to said fishery, giving public notice of the kind and
description of the fish so chosen and set apart; and he also
had the right, in lieu of the foregoing, to prohibit, by agree-
ment with the tenants upon his Ahupuaa or Ili, all fishing
upon his said fishing grounds during certain months of
the year, and during the fishing season to exact from each
fisherman one-third of all the fish taken upon said fishing
ground. Subject to the foregoing restrictions, his tenants
had the right to fish at will upon said fishing ground, but
the occupants and residents of one Ahupuaa or Ili had
not the right, nor were they permitted to fish upon the
fishing grounds of any other Ahupuaa or Ili but were
restricted rigidly to the use of those rights which they
had on the fishing ground connected with the Ahupuaa or
Ili on which they resided." This declaration is consistent
with the holdings of this court.

Under the admissions referred to and by virtue of

known as "Bill of Rights," Haw. Laws 1839, c. 3, § 8, as amended
November 9, 1840, Haw. Laws 1842, pp. 36, et seq.; Fundamental Laws
of Hawaii, pp. 21, 22, cited and applied in Carter v. Ter. of Hawaii,
14 Haw. 465, 471; Levi Haalelea v. Daniel Montgomery, 2 Haw. 62, 65;
Act April 1, 1841, Fundamental Laws of Hawaii, p. 54, cited in Carter
v. Ter. of Hawaii, supra; Second Act of Kamehameha III of April 27,
1846, pt. 1, c. VI, art. V, §§ I-XIV, 1 Statute Laws of His Majesty
Kamehameha III, pp. 90-94, cited and applied in Levi Haalelea
v. Daniel Montgomery, supra, 65; Carter v. Ter. of Hawaii, supra, 471.
Included in official codification and revision "Civil Code of the Hawaiian
Islands 1859" as §§ 387-392, both inclusive, and § 394.

the provisions of the Second Act of Kamehameha III of April 27, 1846, pt. 1, c. VI, art. V, §§ II-VII, both inclusive, upon the award of the ahupuaa of Makalawena to Akahi there inured to her the private right of piscary upon the fishing ground, which by ancient regulation belonged to said ahupuaa, subject to the limitation and restrictions imposed by the provisions of law pertaining to private rights of piscary.

On June 4, 1884, Akahi having paid the government commutation on award 5368, apana 3, a royal patent in confirmation thereof was issued to her of the ahupuaa of Makalawena, pursuant to law.[24] The premises granted are described in the patent by metes and bounds and the title conveyed is a fee simple absolute. Upon the issuance of the royal patent, Akahi's title in fee simple in and to the ahupuaa of Makalawena and the private fishing right, which by ancient regulation belonged to the same, became absolute. It is further recited in the agreed statement that from Akahi the said ahupuaa of Makalawena, together with its said fishery, passed by various conveyances, all prior to the annexation of Hawaii and prior to the passage of said Organic Act, to the trustees under the will of Bernice Pauahi Bishop, the predecessors in title and trust of the present trustees.

The agreed statement recites that for a period long prior to the mahele and down to and including the date of the submission (May 4, 1933), the ahupuaa of Makalawena had always had and still and then had numerous tenants[25] living thereon both as owners and occupants of

---

[24] Haw. Laws 1872, c. XXI, p. 18. For legal effect of patent issued upon award of board of commissioners to quiet land titles see: *Thurston* v. *Allen*, 8 Haw. 392, 402.

[25] For the meaning and legal significance of the term "tenants" see: *Levi Haalelea* v. *Daniel Montgomery*, 2 Haw. 62; *Hatton* v. *Piopio*, 6 Haw. 334; *Shipman* v. *Crown Land Commissioners*, 6 Haw. 351, 353.

kuleanas therein and otherwise; that J. H. Mahiko and Ane Una, parties hereto, were and long prior to 1900 and long prior to the passage of the Hawaiian Organic Act had been tenants on and of the ahupuaa of Makalawena. At the time of the issuance to Akahi of the award of the ahupuaa of Makalawena, the then existing law pertaining to private fisheries provided that the konohikis should be considered in law the holders of private fisheries for the equal use of themselves and of the tenants on the respective lands and granted to such tenants certain liberties in the fisheries of their landlords subject to the restrictions therein imposed.

Subsequent to 1855 the laws pertaining to private fisheries remained substantially the same except for certain clarifying legislation passed in 1892[26] and police regulations passed in 1872,[27] in 1888[28] and in 1892.[29] With the police regulations referred to, we are not concerned. In 1897 the existing laws pertaining to private fisheries were incorporated into the compilation prepared by Honorable Sidney M. Ballou, known as the Penal Laws of 1897 and are quoted in full in the margin.[30] During the period

[26] Haw. Laws 1892, c. XVIII, p. 21.

[27] Haw. Laws 1872, c. II, p. 4.

[28] Haw. Laws 1888, c. XXX, p. 69.

[29] Haw. Laws 1892, c. X, p. 13.

[30] "§ 1452. The fishing grounds from the reefs, and where there happen to be no reefs, from the distance of one geographical mile seaward to the beach at low water mark, shall, in law, be considered the private property of the konohikis, whose lands, by ancient regulation, belong to the same; in the possession of which private fisheries, the said konohikis shall not be molested, except to the extent of the reservations and prohibitions hereinafter set forth." (Another translation of the original Act is as follows: "The fishing places from the beach to the breakers, and at places where there are no breakers, from the beach to a point makai [outward] one mile, these places are intended by law to belong to the Konohikis who own the land, to those indeed who own the land according to ancient division. The Konohikis shall not be restricted while fishing in these places, with the exception, how-

between the annexation of Hawaii to the United States, effected by the "Joint Resolution To provide for annexing the Hawaiian Islands to the United States"[31] the laws of

---

ever, of certain other restrictions as stated below.")

"§ 1453. The konohikis shall be considered in law to hold said private fisheries for the equal use of themselves and of the tenants on their respective lands, and the tenants shall be at liberty to take from such fisheries, either for their own use, or for sale or exportation, but subject to the restrictions imposed by law, all fish, sea-weed, shell-fish and other edible products of said fisheries.

"§ 1454. The konohikis shall have power each year to set apart for themselves one given species or variety of fish natural to their respective fisheries, giving public notice, by *viva voce* proclamation, and by at least three written or printed notices posted in conspicuous places on the land, to their tenants and others residing on their lands, signifying the kind and description of ·fish which they have chosen to be set apart for themselves.

"§ 1455. The specific fish so set apart shall be exclusively for the use of the konohiki, if caught within the bounds of his fishery, and neither his tenants nor others shall be at liberty to appropriate such reserved fish to their private use, but when caught, such reserved fish shall be the property of the konohiki, for which he shall be at liberty to sue and recover the value from any person appropriating the same.

"§ 1456. The konohikis shall not have power to lay any tax, or to impose any other restriction, upon their tenants, regarding the private fisheries, than is hereinbefore prescribed, neither shall any such further restriction be valid.

"§ 1457. It shall be competent to the konohikis, on consultation with the tenants of their lands, in lieu of setting apart some particular fish to their exclusive use, as hereinbefore allowed, to prohibit during certain months in the year, all fishing upon their fisheries; and, during the fishing season, to exact of each fisherman among the tenants, one-third part of all the fish taken upon their private fishing grounds. In every such case it shall be incumbent on the konohikis to give the notice prescribed in Section 1454. * * *

"§ 1459. If that species of fish which has been tabooed by any konohiki, shall go on to the grounds which have been, or may be, given to the people, such fish shall not be tabooed thereon. It shall be tabooed only when caught within the bounds of the konohiki's private fishery. Nor shall it be lawful for a konohiki to taboo more than one kind of fish upon any fishing grounds which lie adjacent to each other."

[31] Resolution No. 55 known as "Newlands Resolution" of July 7, 1898, 30 Stat. L. 750.

Hawaii including the laws relative to private fisheries, with exceptions unnecessary to our consideration, continued in force.

We are also of the opinion that for the purposes of this submission the respective statutory rights of the trustees and of the tenants in the fishery of Makalawena, as they existed prior to the effective date of the Organic Act, must be presumed to have been vested within the meaning of the term "vested rights" as used and employed in section 95 of the Hawaiian Organic Act.

By section 95 of the Hawaiian Organic Act, all laws of the Republic of Hawaii which conferred exclusive fishing rights were repealed and all fisheries in the sea waters of the Territory not included in any fish pond or artificial enclosure were declared to be free to all citizens of the United States, subject, however, to vested rights. It was also thereby provided that no such vested rights should be valid after three years from the taking effect of the Act unless established as provided in section 96 of the Act. By section 96 of the Act it was provided that any person who claimed a private right to any such fishery should, within two years after the taking effect of the Act, initiate legal proceedings to establish such fishery in the manner therein provided. The full text of sections 95 and 96 of the Hawaiian Organic Act is quoted in the margin.[32] The "private rights" referred to in section 96 of the Hawaiian

---

[32] "Sec. 95. Repeal of laws conferring exclusive fishing rights. That all laws of the Republic of Hawaii which confer exclusive fishing rights upon any person or persons are hereby repealed, and all fisheries in the sea waters of the Territory of Hawaii not included in any fish pond or artificial inclosure shall be free to all citizens of the United States, subject, however, to vested rights; but no such vested right shall be valid after three years from the taking effect of this Act unless established as hereinafter provided.

"Sec. 96. Proceedings for opening fisheries to citizens. That any person who claims a private right to any such fishery shall, within

Organic Act obviously refer to "vested rights" to which public fisheries in the sea waters of the Territory, not included in any fish pond or artificial enclosure by section 95, were made subject and in default of the establishment of which within the statutory period became invalid. As heretofore stated, the only questions in difference between the parties to the submission which might be the subject of a civil action are whether the trustees and tenants on the one hand, to the extent of their respective rights in the fishery of Makalawena, as defined by the laws of the Republic of Hawaii pertaining to private fisheries as they existed immediately prior to the effective date of the Hawaiian Organic Act, are the owners of the fishery of Makalawena or whether the said fishery is the sole property of the United States and whether sections 95 and 96 are violative of the provisions of article V of the amendments of the Constitution of the United States in the particulars stated. The Territory, however, in effect admits that in any civil action of which the agreed statement is a substitute there would have been available to the trustees and tenants the claim that sections 95 and 96 of the Hawaiian Organic Act were unconstitutional. Under the circumstances it does not lie in the mouth of the Territory to say that the respective claims of the trustees and

two years after the taking effect of this Act, file his petition in a circuit court of the Territory of Hawaii, setting forth his claim to such fishing right, service of which petition shall be made upon the attorney-general, who shall conduct the case for the Territory, and such case shall be conducted as an ordinary action at law.

"That if such fishing right be established the attorney-general of the Territory of Hawaii may proceed, in such manner as may be provided by law for the condemnation of property for public use, to condemn such private right of fishing to the use of the citizens of the United States upon making just compensation, which compensation, when lawfully ascertained, shall be paid out of any money in the treasury of the Territory of Hawaii not otherwise appropriated."

tenants to the fishery of Makalawena are not vested. The two issues are inconsistent and cannot coexist as bases of questions in difference which may be the subject of a civil action within the meaning of R. L. H. 1935, § 3616.

It must be accepted as axiomatic that in any civil action, of which the within submission might be a substitute, neither the trustees nor tenants, unless they were the owners of vested rights, could be heard to challenge the constitutionality of sections 95 and 96 of the Hawaiian Organic 'Act.[33] All parties are agreed that if neither the trustees nor the tenants, upon the effective date of the Hawaiian Organic Act, were owners of vested rights in the sea fishery of Makalawena they are not now in a position to complain of the provisions of sections 95 and 96 of said Act rendering said rights invalid in the event of the failure of the establishment of the fishery within the time prescribed. Syllogistically the admission that there is available to the trustees and to the tenants the right to challenge the constitutionality of sections 95 and 96 of the Hawaiian Organic Act demands the conclusion that the respective rights entitling them to take that position were vested rights. Under the terms of the within submission, the Territory of Hawaii must therefore be considered, despite the interjection of its contention to the contrary, as admitting, for the purposes of the submission at least, that the trustees and tenants of the ahupuaa of Makalawena were, upon the effective date of the Hawaiian Organic Act, the owners of "vested rights" in the sea fishery of Makalawena. _

This brings us to a consideration of the objections to

---

[33] 12 C. J., tit. Constitutional Law § 177; *The King* v. *Young Tang*, 7 Haw. 49; *Territory* v. *Miguel*, 18 Haw. 402; *Emmeluth* v. *Board of Supervisors*, 19 Haw. 171; *In Re Craig*, 20 Haw. 483; *Territory* v. *Hoy Chong*, 21 Haw. 39; *Wilder* v. *Colburn*, 21 Haw. 701; *Anderson* v. *Hawn. Drdg. Co.*, 24 Haw. 97.

the constitutionality of sections 95 and 96 of the Hawaiian Organic Act. Our consideration of the question of constitutionality is upon the premise that immediately prior to the effective date of the Hawaiian Organic Act the then predecessor trustees of the present trustees, under the will and of the estate of Bernice Pauahi Bishop, deceased, were the "konohikis" and the tenants of the ahupuaa of Makalawena were the "tenants" of said ahupuaa, within the respective meanings of the terms "konohikis" and "tenants," as the same were used in the laws of the Republic of Hawaii, pertaining to exclusive fishing rights, included in sections 1452 to 1459, both inclusive, of the Penal Laws of 1897; that by ancient regulation the fishery of Makalawena belonged to the ahupuaa of that name of which the then predecessor trustees were konohikis and the tenants were tenants as aforesaid; that the respective rights of the konohikis and tenants in and to the said fishery of Makalawena, as defined by statute, were "vested rights" within the meaning of the term "vested rights" as used and employed in section 95 of the Hawaiian Organic Act and that the predecessor trustees and tenants were "persons" claiming a private right to an exclusive fishing right and included in the term "any person," appearing in the phrase "any person who claims a private right to any such fishery," in section 96 of the Hawaiian Organic Act, upon whom was imposed by said section the duty to have judicially established the fishery of Makalawena at the time and in the manner by said section prescribed. It is admitted in the agreed statement of facts that no petition to establish the title of the fishery of Makalawena was filed in any circuit court of the Territory of Hawaii by the trustees or their predecessors in title and interest or by anyone on their behalf or by or for any tenants on said ahupuaa within two years after the taking effect of said Organic Act or at any time.

We shall first consider the objection that the provisions of sections 95 and 96 of the Hawaiian Organic Act are violative of the "due process" clause of the fifth amendment of the Constitution of the United States. This objection depends for its determination upon the single question of whether the method adopted by the Congress of the United States for the acquisition of private vested fishing rights denies "due process."

Explicit and implicit in sections 95 and 96 of the Hawaiian Organic Act is the purpose of the Congress of the United States to make all fisheries in the sea waters of the Territory, not included in any fish pond or artificial enclosure, free to all citizens of the United States. To that end it repealed all of the pre-existing laws of the Republic of Hawaii which conferred exclusive fishing rights and provided a method by which, in conjunction with the local statutes pertaining to eminent domain, private fishing rights, which in law constituted vested rights, might be segregated and acquired for the use of the citizens of the United States upon making just compensation. No claim is made that the Congress of the United States was without authority to repeal the pre-existing laws of the Republic of Hawaii which conferred exclusive fishing rights.

The Federal Constitution makes no attempt to define "due process of law" or its equivalent. The courts have refrained from attempting to give a definition covering all possible cases and are disposed to ascertain the intent and application of the term by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasoning on which such decisions may be founded.[34] The most comprehensive definition of "due process" that research has developed

---

[34] *Davidson* v. *New Orleans*, 6 Otto 97, 104 (U. S.).

is that of Mr. Justice Johnson, found in the opinion of the court in the case of *Bank of Columbia* v. *Okely*, 4 Wheat. 235, 242 (U. S.) : "As to the words from *Magna Charta*, incorporated into the constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at length settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice." This definition is cited with approval in *United States* v. *Cruikshank, et al.*, 2 Otto 542, 554 (U. S.), and *Scott* v. *McNeal*, 154 U. S. 34, 45. Mr. Justice Matthews, in *Hurtado* v. *California*, 110 U. S. 516, 532, refers to the "fundamental maxim of distributed justice-*suum cuique tribuere.*" The most widely accepted definition of due process is that of Judge Cooley: "Due process of law in each particular case means, such an exertion of the powers of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as those maxims prescribe for the 'class' of cases to which the one in question belongs."[35] Professor McGehee, in his admirable compendium on "due process of law," states that its meaning, as developed in American decisions, implies "the administration of equal laws according to established rules, not violative of the fundamental principles of private right, by a competent tribunal having jurisdiction of the case and proceeding upon notice and hearing."[36]

In judging what is "due process" resort may be had "to the cause and object of the taking" and if "found to be suitable or admissible in the special case" it will be adjudged to be "due process of law." As said by Mr. Justice Bradley: "I think, therefore, we are entitled,

---

[35] Cooley's Constitutional Limitations (7th ed.), p. 506.

[36] McGehee, Due Process of Law, p. 1.

under the fourteenth amendment, not only to see that there is some process of law, but 'due process of law,' provided by the State law when a citizen is deprived of his property; and that, in judging what is 'due process of law,' respect must be had to the cause and object of the taking, whether under the taxing power, the power of eminent domain, or the power of assessment for local improvements, or none of these: and if found to be suitable or admissible in the special case, it will be adjudged to be 'due process of law;' but if found to be arbitrary, oppressive, and unjust, it may be declared to be not 'due process of law.' Such an examination may be made without interfering with that large discretion which every legislative power has of making wide modifications in the forms of procedure in each case, according as the laws, habits, customs, and preferences of the people of the particular State may require."[37]

"Due process" is necessarily a relative term. Unless the constitutionality of the legislation under review appears from the Act itself the presence or absence of "due process" depends upon the facts and circumstances of the particular case in which it is involved. "It is sufficient to observe here, that by 'due process' is meant one which, following the forms of law, is appropriate to the case, and just to the parties to be affected. It must be pursued in the ordinary mode prescribed by the law; it must be adapted to the end to be attained; and wherever it is necessary for the protection of the parties, it must give them an opportunity to be heard respecting the justice of the judgment sought. The clause in question means, therefore, that there can be no proceeding against life, liberty, or property which may result in the deprivation of either, without the observance of those general rules

---

[37] Concurring opinion in *Davidson* v. *New Orleans*, 6 Otto 97, 107, 108 (U. S.).

established in our system of jurisprudence for the security of private rights."[38]

Included in the paramount rights of the State is the power of eminent domain. It is an attribute of sovereignty of the State and the power resides in and may be exercised by the legislative department of government. The enjoyment of property by the individual is always subject to the sovereign needs of the State acting for the common good of the whole people and the State in its exercise of the sovereign power of eminent domain may "take" the rights of the citizen even though vested.[39] Constitutional limitations upon the exercise of the power of eminent domain "demand that the purpose for which the appropriation is made must be a public purpose; that the appropriation be accompanied with just compensation to the owner of the property; and in general the presence of notice and a hearing is necessary on judicial questions involved."[40] The procedure to be employed in the exercise of the power of eminent domain is for the legislature exclusively "subject to special constitutional provisions and to the general requirement of notice and hearing."[41]

By the provisions of sections 95 and 96 of the Hawaiian Organic Act, the Congress of the United States decided the intrinsic and circumstantial necessity of the exercise of the power of eminent domain, designated the property to be taken and delegated to the Territory the authority of its exercise.

It is a generally accepted principle of constitutional law that when the State is acting in a sovereign capacity

---

[38] *Hagar* v. *Reclamation District No. 108*, 111 U. S. 701, 708.

[39] *Crowley* v. *Christensen*, 137 U. S. 86; *Reduction Company* v. *Sanitary Works*, 199 U. S. 306.

[40] McGehee, Due Process of Law, p. 255.

[41] *Id.* p. 274.

its acts are for the good of the whole community and private rights and interest must yield to this paramount object.[42]

The burden of showing that an Act of the legislature is unconstitutional is on the party asserting it.[43] Every enactment of the legislature carries a presumption of constitutional validity and should be upheld by the courts unless it has been shown to be, beyond all reasonable doubt, in violation of the Constitution.[44] Moreover, the facts adduced to show unconstitutionality must be clear and convincing and must show beyond question that the legislature exceeded the limits marked by the Constitution.[45]

The nature and incidents of the title of the United States in the sea waters of a territory of the United States have a direct relation to the proceedings prescribed by sections 95 and 96 of the Hawaiian Organic Act for the acquisition of subsisting private fishing rights created by the pre-existing laws of the Republic of Hawaii and are material to the question whether such proceedings were "suitable or admissible in the special case" and not "arbitrary, oppressive and unjust."

By article I of the Treaty of Annexation between the Republic of Hawaii and the United States of America, dated June 16, 1897, there was ceded by the former to the latter, absolutely and without reserve, all rights of sovereignty of whatsoever kind in and of the Hawaiian Islands and their dependencies.[46] By article II of the Treaty of

---

[42] McGehee, Due Process of Law, p. 60.

[43] *Smeltzer* v. *St. Louis & S. F. R. Co.*, 158 Fed. 649, 652.

[44] *Ogden* v. *Saunders*, 12 Wheat. 132 (U. S.); *Butler* v. *Pennsylvania*, 10 How. 402; *Booth* v. *Illinois*, 184 U. S. 425; *Henderson Bridge Co.* v. *Henderson City*, 173 U. S. 592, 615; *Interstate Railway Co.* v. *Massachusetts*, 207 U. S. 79, 88.

[45] *State Ex Rel. Warson* v. *Howell*, 92 Wash. 540, 159 Pac. 777.

[46] Haw. Laws (Sp. S.) 1897; R. L. H. 1935, p. 34A.

Annexation there was ceded and transferred to the United States the absolute fee and ownership of all public, government or crown lands, ports, harbors and other public property of every kind and description belonging to the government of the Hawaiian Islands.[47] By the Joint Resolution of the Congress of the United States, providing for the annexing of the Hawaiian Islands, known as the Newlands Resolution, approved July 7, 1898, it was resolved that said cession be "accepted, ratified, and confirmed, and that the said Hawaiian Islands and their dependencies be, and they are hereby, annexed as a part of the territory of the United States and are subject to the sovereign dominion thereof."[48] Neither in the Treaty of Annexation nor in Newlands Resolution were the Hawaiian Islands and their dependencies expressly defined. The Hawaiian Organic Act[49] simply referred to the territory acquired from the Republic of Hawaii as "the Islands acquired by the United States of America under an Act of Congress entitled 'Joint resolution to provide for annexing the Hawaiian Islands * * *' approved," etc.[50] The Hawaiian Islands consisted of numerous islands, reefs and shoals, the principal islands of which, in the order of their size, were: Hawaii, Maui, Oahu, Kauai, Molokai, Lanai, Niihau and Kahoolawe. The constitution of the Republic of Hawaii provided that the territory of the Republic of Hawaii should be that theretofore constituting the Kingdom of the Hawaiian Islands and the territory ruled over by the Provisional Government of Hawaii or which might thereafter be added to the Republic.[51]

The reference to the "Hawaiian Islands" in the Treaty

---

[47] *Id.*; R. L. H. 1935, p. 34A.

[48] 30 Stat. L. 750, Resolution No. 55, approved July 7, 1898.

[49] Act of Congress of April 30, 1900, 31 Stat. L. c. 339, p. 141.

[50] Hawaiian Organic Act § 2.

[51] Constitution of the Republic of Hawaii, art. 15, Civil Laws 1897.

of Annexation and Newlands Resolution embraced the intervening and surrounding waters as well as the uplands.[52] By the common law the shores of the sea and navigable rivers within the flux and reflux of the tide belonged *prima facie* to the King.[53] As said by this court in *Carter* v. *Ter. of Hawaii*, 14 Haw. 465, 468, 469: "At common law the title and dominion of the sea and navigable rivers and arms of the sea within the Territorial jurisdiction were in the King * * * . This jurisdiction was held to extend one marine league from the beach at low water mark." In Gould on "Waters" it is said: "It is somewhat different with respect to those parts of the sea which adjoin the shores of civilized nations. By general consent they have been regarded as capable of appropriation, and of being held by a kind of possession. Maritime countries have claimed from the earliest times more or less extended dominion over these waters, and subjected them to the laws and regulations of the state; and upon grounds of self-protection and mutual advantage to all such countries, the dominion of the land has been acknowledged to carry with it the control of the contiguous seas, and the exclusive right to enjoy whatever of value may be acquired therefrom. The dominion over the territorial seas, as they are called, may, therefore, include rights of jurisdiction, or of property, or both. By the modern law of nations, the territorial waters extend only to such distance as is capable of command from the shore, or the presumed range of cannon, which, for the purpose of certainty, is regarded as one marine league, although, for the purpose of self-protection in time of war, and for the prevention of frauds upon its revenue, each nation is

---

[52] *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, 89.

[53] *Moulton* v. *Libbey*, 37 Me. 472; *Commonwealth* v. *Hilton*, 174 Mass. 29, 54 N. E. 362; *State* v. *Leavitt*, 105 Me. 76, 72 Atl. 875.

accustomed to exercise authority beyond this limit."[54]   By
part 1, chapter VI, article I, section 1 of the Second Act of
Kamehameha III (April 27, 1846), *supra*, it was provided:
"The jurisdiction of the Hawaiian Islands shall extend
and be exclusive for the distance of one marine league
seaward, surrounding each of the islands of Hawaii, Maui,
Kahoolawe, Lanai, Molokai, Oahu, Kauai and Niihau;
commencing at low water mark on each of the respective
coasts of said islands.   The marine jurisdiction of the
Hawaiian Islands shall also be exclusive in all the channels
passing between the respective islands, and dividing them;
which jurisdiction shall extend from island to island."
As early as 1849 this court held that by the law of nations
every State extends to the ports, harbors, bays, mouths of
rivers, adjacent parts of the sea enclosed by headlands
belonging to the same State; that the general usage of
nations superadds "to this extent of territorial jurisdiction
a distance of a marine league, or as far as a cannon shot
will reach from the shore, along all the coasts of the state"
and "within these limits its rights of property and terri-
torial jurisdiction are absolute and exclude those of every
other nation."[55]   By resolution of the Privy Council of
the Kingdom of Hawaii of August 29, 1850, it was de-
clared:   "That the rights of the King as Sovereign extend
from high Water Mark to a Marine league to Seaward,
and to all Navigable Straits and passages, among the
Islands, and no private right can be sustained, except
private rights of fishing, and of cutting Stone from the
Rocks, as provided for and reserved by law."[56]   This court
again in 1899 expressly held that under the laws of the
Republic of Hawaii "the harbors and channels of this

[54] Gould, Waters (3d ed.) § 2, pp. 3, 4.

[55] *The King* v. *Parish et al.*, 1 Haw. 58, 60, 61.

[56] 3 Privy Council Records 791.

country are government property."[57]   The United States
Supreme Court has held that title to lands covered by
navigable waters passed in a colonial charter as a "pre-
rogative right" as one of the "royalties incident to the
powers of government."[58]  It has been said that the several
States hold the public fishery rights in trust for the public
and as to them they exercise not only the rights of sov-
ereignty but also the rights of property.[59]  Whatever the
source of title, the result is the same.  Title to the shores
of the islands composing the Hawaiian Islands passed,
upon the adoption of the Newlands Resolution, to the
United States and they thereupon became the sole property
of the United States, subject to vested rights.

By the transfer of the Hawaiian Islands to the United
States neither the submerged lands within the jurisdiction
of the Republic of Hawaii nor the sea waters covering the
same vested in the United States in a proprietary sense.
The United States, similarly as the original States, had,
in respect to the shores within the jurisdiction of the
United States, adopted the principles of the common law.[60]
"By the common law, both the title and the dominion of
the sea, and of rivers and arms of the sea, where the tide
ebbs and flows, and of all the lands below high water
mark, within the jurisdiction of the Crown of England,
are in the King.  Such waters, and the lands which they
cover, either at all times, or at least when the tide is in,
are incapable of ordinary and private occupation, cultiva-
tion and improvement; and their natural and primary
uses are public in their nature, for highways of navigation

[57] *King* v. *Oahu Railway & Land Co.*, 11 Haw. 717, 721.

[58] *Martin et al.* v. *Waddell*, 16 Pet. 367, 413.

[59] *Commonwealth* v. *Hilton*, 174 Mass. 29, 54 N. E. 362; *McCready*
v. *Virginia*, 4 Otto 391, 394 (U. S.) ; *State* v. *Leavitt*, 105 Me. 76, 72
Atl. 875.

[60] *Shively* v. *Bowlby*, 152 U. S. 1; *Pollard's Lessee* v. *Hagan*, 3 How.
212 (U. S.) ; *Martin* v. *Waddell*, 16 Pet. 367, 410 (U. S.).

and commerce, domestic and foreign, and for the purpose of fishing by all the King's subjects. Therefore the title, *jus privatum*, in such lands, as of waste and unoccupied lands, belongs to the King as the sovereign; and the dominion thereof, *jus publicum*, is vested in him as the representative of the nation and for the public benefit. The great authority in the law of England upon this subject is Lord Chief Justice Hale, whose authorship of the treatise *De Jure Maris*, sometimes questioned, has been put beyond doubt by recent researches. Moore on the Foreshore (3d ed.), 318, 370, 413. In that treatise, Lord Hale, speaking of 'the King's right of propriety or ownership in the sea and soil thereof' within his jurisdiction, lays down the following propositions: 'The right of fishing in this sea and the creeks and arms thereof is originally lodged in the Crown, as the right of depasturing is originally lodged in the owner of the waste whereof he is lord, or as the right of fishing belongs to him that is the owner of a private or inland river.' 'But though the King is the owner of this great waste, and as a consequent of his propriety hath the primary right of fishing in the sea and the creeks and arms thereof; yet the common people of England have regularly a liberty of fishing in the sea or creeks or arms thereof, as a public common of piscary, and may not without injury to their right be restrained of it, unless in such places, creeks or navigable rivers, where either the King or some particular subject hath gained a propriety exclusive of that common liberty.' 'The shore is that ground that is between the ordinary high water and low water mark. This doth *prima facie* and of common right belong to the King, both in the shore of the sea and the shore of the arms of the sea.' Hargrave's Law Tracts, 11, 12. And he afterwards explains: 'Yet they may belong to the subject in point of propriety, not only by charter or grant, whereof there can be but little

doubt, but also by prescription or usage.' 'But though the subject may thus have the propriety of a navigable river part of a port, yet these cautions are to be added, viz.' '2d. That the people have a public interest, a *jus publicum,* of passage and repassage with their goods by water, and must not be obstructed by nuisances.' 'For the *jus privatum* of the owner or proprietor is charged with and subject to that *jus publicum* which belongs to the King's subjects; as the soil of an highway is, which though in point of property it may be a private man's freehold, yet it is charged with a public interest of the people, which may not be prejudiced or damnified.' "[61] Soil below low-water mark is held by the State "not only subject to, but in some sense in trust for, the enjoyment of certain public rights, among which is the common liberty of taking fish."[62] The principle has long been settled that each State owns the beds of all tidewaters within its jurisdiction, unless they have been granted away, and the fish in them so far as they are capable of ownership while running.[63] The nature and incidents of the tenure of the United States of the shore and land under tide waters of a territory of the United States is thus expressed by Mr. Justice Gray: "The Territories acquired by Congress, whether by deed of cession from the original States, or by treaty with a foreign country, are held with the object, as soon as their population and condition justify it, of being admitted into the Union as States, upon an equal footing with the original States in all respects; and the title and dominion of the tide waters and the lands under them are held by the United States for the benefit of the whole people, and, as this court has often said, in cases above cited, 'in trust for the future States.' *Pollard* v. *Hagan,* 3 How. 212, 221,

[61] *Shively* v. *Bowlby,* 152 U. S. 1, 11, 25, 36.

[62] *Smith* v. *State of Maryland,* 18 How. 71, 74, 75 (U. S.).

[63] *McCready* v. *Virginia,* 4 Otto 391, 394 (U. S.).

222; *Weber* v. *Harbor Commissioners*, 18 Wall. 57, 65.; *Knight* v. *United States Land Association*, 142 U. S. 161, 183. The Congress of the United States, in disposing of the public lands, has constantly acted upon the theory that those lands, whether in the interior, or on the coast, above high-water mark, may be taken up by actual occupants, in order to encourage the settlement of the country; but that the navigable waters and the soils under them, whether within or above the ebb and flow of the tide, shall be and remain public highways; and, being chiefly valuable for the public purposes of commerce, navigation and fishery, and for the improvements necessary to secure and promote those purposes, shall not be granted away during the period of territorial government; but, unless in case of some international duty or public exigency, shall be held by the United States in trust for the future States, and shall vest in the several States, when organized and admitted into the Union, with all the powers and prerogatives appertaining to the older States in regard to such waters and soils within their respective jurisdictions; in short, shall not be disposed of piecemeal to individuals as private property, but shall be held as a whole for the purpose of being ultimately administered and dealt with for the public benefit by the State, after it shall have become a completely organized community."[64] If paraphrased to apply to the United States, the following language of Mr. Chief Justice Waite is apt: "The State holds its different kinds of property in different rights. It has its private property, which it can control as fully as the private citizen can his. It also has its public property, which its citizens and those of other States can use and enjoy but not appropriate, such as its public buildings and grounds. It also holds a third class of property,

---

[64] *Shively* v. *Bowlby*, 152 U. S. 1, 48, 49, 50.

such as its floating and embedded fish, as to which there can be no use or enjoyment except in appropriation; and when the right of user by appropriation is given by the State to its own citizens, the Federal Constitution secures the same right to the citizens of the other States."[65]

Upon the adoption of the Newlands Resolution and the transfer to the United States of the Hawaiian Islands "the entire dominion and sovereignty, national and municipal, Federal and state" over the newly acquired territory vested in the United States[66] and under the Constitution was committed to the Congress of the United States, its regulation and control, including the power to make the sea fisheries of the islands free to the use of the citizens of the United States and, in its discretion, to provide the ways and means fairly and reasonably necessary to that purpose. Every nation acquiring territory by treaty or otherwise holds the acquired territory subject to the constitution and laws of its own government and not according to those of the government ceding it.[67] When the United States accepted the cession to them of the Hawaiian Islands, they took upon themselves to hold the same subject to the Constitution and laws of the United States and not according to those of the Republic of Hawaii.[68] Inherent in the Congress reposed the power to open to the public for the common right of fishery the sea waters of the Territory. The submerged land of the Territory was the property of the United States and within a territory where the entire dominion and sovereignty rested in the United States and over which Congress had complete legislative authority.[69]

---

[65] *McCready* v. *Virginia*, 4 Otto 391 (U. S.).

[66] *Shively* v. *Bowlby*, 152 U. S. 1, 48.

[67] *Pollard's Lessee* v. *Hagan*, 3 How. 212, 225 (U. S.).

[68] *Ibid.*

[69] *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, 87.

The procedure adopted by the Congress of the United States and incorporated into sections 95 and 96 of the Hawaiian Organic Act, to make the sea fisheries of the Territory free to the citizens of the United States, has a direct relation to the conditions existing in Hawaii immediately prior to the passage of the Organic Act in respect to private fishing rights. And, if the procedure adopted was "suitable or admissible in the special case" and not "arbitrary, oppressive, and unjust," such procedure constituted "due process."

It is recited in the agreed statement that fisheries were considered as appurtenant or belonging to the respective ahupuaas upon which they fronted; that an ili kupono sometimes had a fishery separate and distinct from the fishery of the ahupuaa; that an ili kupono belonged usually to an outsider and had little if any relation to the ahupuaa except that it was often situated within the boundaries of the ahupuaa; that the fishery of the ili kupono was carved out of the area of the fishery of the ahupuaa within which the ili was located; that certain konohikis of ili kuponos not fronting on the sea possessed appurtenant fishing rights; that to every ahupuaa which fronted on the sea there belonged a fishing right; that there "are" approximately 2930 ahupuaas and ilis comprised within the eight larger islands of the Hawaiian group; that of this number 2930 ahupuaas and ilis, approximately 1727 have no sea frontage at all; that of the remaining number of 1203 fronting on the sea, there are approximately 840 ahupuaas and ilis which were at one time crown and government land, and 363 konohiki lands.

At the time of the annexation of the Hawaiian Islands to the United States, no official records of the boundaries of private fishing rights were in existence. The trustees and tenants, in their opening brief, concede that while fisheries were all well known as to name, location and

description, these descriptions in the early history of Hawaii were not a matter of written record.[70]

Sections 95 and 96 of the Hawaiian Organic Act did not require any "public controlling necessity," as we understand the term, to justify their enactment. The absence of official records from which the boundaries of existing private fisheries might be ascertained is sufficient justification for their enactment.

The original statutory grant of private rights of piscary in the sea waters adjoining the Islands by the ordinance of 1839 did not contemplate an ultimate official determination of their boundaries. The fisheries were apportioned under the ordinance accordingly as they existed by "ancient regulation." Under the statutes defining private fishing rights, the extent of the area subject to a statutory private fishing right depended upon "ancient regulation."[71] Proof of the incidents of ancient regulation, including the boundaries of private sea fisheries, depended upon the facts. Counsel for the trustees and tenants take the position "that once the extent of the shore frontage of the ahupuaa [or ili] was established, the statute itself determined the other boundaries, and fixed the makai boundary at the reef *opposite* [italics theirs] the shore, and the side boundaries as direct lines from the two ends of the shore boundary to the corresponding two ends of the makai boundary, that the shore boundary having been fixed by the government surveys, the other boundaries were merely a matter of application of the statute." And in support of this position they cite *Rust* v. *Boston Mill Corporation,* 6 Pick. 158 (Mass.) ; *Gray* v. *Deluce & others,* 5 Cush. 9 (Mass.) ; *Commonwealth* v. *Vincent,* 108 Mass. 441; *Stuart* v. *Greanyea,* 154 Mich. 132, 117 N. W. 655;

[70] Opening brief of trustees and tenants, p. 6.
[71] Second Act Kamehameha III, art. V, § II.

1 Tiffany, Real Property (2d ed.) § 309, p. 1036; and Gould, Waters (2d ed) § 185.

With the claim that the local statutes pertaining to private fisheries contained the definition of their boundaries, we cannot agree. The statutes pertaining to private fisheries do not fix the boundary at the reef as "opposite" to the shore. These statutes neither use the word "opposite" nor contain the implication that private fisheries lay opposite to the shore of the land to which the same belonged. On the contrary, they carry an opposite implication. Penal Laws, 1897, § 1452, refer to the "beach" and to the "reef," and where there happens to be no reef, one geographical mile seaward to the beach at low water, as the limitations between which private fishing grounds were the private property of the konohikis to whose lands by ancient regulation said fisheries belonged. There is nothing in the section referred to that indicates that the fishery at the beach was in all cases conterminous in its entire extent with the sea boundary of the lands to which the fishery belonged. Moreover, implicit in section 1452 is the imputation that within the limitations of the beach and the reef, and where there happened to be no reef, from the distance of one geographical mile seaward from the beach at low-water mark, the boundaries of the fishery were fixed and determined by ancient regulation. This is borne out by the provisions of Penal Laws 1897, § 1455, wherein the "bounds" of the private fishery are referred to, indicating that by ancient regulation the "bounds" of the private fisheries were established and controlled in respect to the rights of adjoining konohikis and the public fisheries seaward.

Nor does the agreed statement support the claim that private sea fisheries uniformly lay "opposite" the land to which the same belonged. In order to adopt counsel's theory, it would be necessary to assume that by ancient

regulation the lateral boundaries of private fisheries conformed in all instances to the shore line of the land to which they belonged, and it would be necessary to further assume that by ancient regulation, where the shore formed an approximate straight line, it constituted the base line to which the lateral boundaries of the fisheries ran at right angles, and where the shore line contained coves or headlands, the lateral boundaries of the fisheries diverged or converged accordingly. The agreed statement is silent upon the subject and the assumptions necessary to support counsel's theory are not inferable from the admitted facts. On the contrary, counsel's assumptions are in direct conflict with their own admissions that "While the fisheries were all well known as to name, location and description, these descriptions in the early history of Hawaii were not a matter of written record."[72]

Nor do the authorities cited by counsel for the trustees and tenants support their claim. In the cases of *Rust* v. *Boston Mill Corporation, supra,* and *Gray* v. *Deluce & others, supra,* p. 12, the respective opinions involved the construction of an ordinance of 1641, by the third section of which it was provided that "In all creeks, coves, and other places where the sea ebbs and flows, the proprietor of the land adjoining shall have propriety to low-water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further." In the case of *Stuart* v. *Greanyea, supra,* p. 133, the court was concerned with the construction of a public Act of Michigan "which prohibited the placing in waters where fish are taken by the legal owner or occupant of adjacent lands any ship ballast, stone *.* * or any species of seines or continuous trap nets *to the extent of the breadth of such legal owner or occupant's lands* [italics ours] so

[72] See note 70.

far as the channel banks of rivers, and to one mile from the beach or shore, at low-water mark of the lakes, straits, inlets, and bays or said waters *fronting* [italics ours] such owners' or occupants' lands, and subjecting any boat owner or captain to punishment who should wilfully run into or molest any pound net," etc. These cases are obviously distinguishable. The citations to *Commonwealth* v. *Vincent, supra,* and to Tiffany and Gould contain no reference to the subject matter under discussion. There is no showing that the boundaries of private fisheries depended for their determination upon any ancient regulation or statute similar in effect to those construed in the Massachusetts and Michigan cases. The boundaries of private fisheries in Hawaii depended solely for their identification upon the facts, except in a few isolated cases where an award, patent or official record might supply a description.

No judicial or administrative procedure existed prior to annexation for officially establishing the boundaries of private fisheries.

The mahele division did not include descriptions of the lands included therein, each land being designated by name.[73] No claim is made that the mahele included any description of fisheries or even a reference to fisheries as belonging to the lands designated.

It is recited in the agreed statement that the land commission awarded not only kuleanas but also ahupuaas and ilis to the konohikis; that some of the chiefs had their ahupuaas and ilis surveyed and had received awards on such lands by survey, but the majority of the ahupuaas and ilis had been awarded simply by name with the understanding that their ancient boundaries should be preserved.

An award by name only was intended to assign what-

---

[73] *In the Matter of the Boundaries of Pulchunui,* 4 Haw. 239, 240; *Ter. of Haw.* v. *Liliuokalani,* 14 Haw. 88.

ever was included in such land according to the boundaries as known and used from ancient times.[74]

The commissioners to quiet titles were without jurisdiction to award fisheries except as the same, in the exercise of their jurisdiction to settle titles to "lands," might incidentally come in question.[75]

It is set forth in the agreed statement that "in only a comparatively few instances did the Land Commission specifically award a fishery." Of the number of such instances, the agreed statement is silent. Of the awards that contained a reference to private fishing rights, the number in which the reference was sufficient to identify the fishery does not appear. It is also set forth in the agreed statement: "In other cases in which the applicant for an award of his Ahupuaa or Ili, also claimed a fishery in connection therewith, and sought for a specific inclusion thereof, in his award, the Commission, in its award included the fishing right in language substantially as follows: 'Together with the right of taking fish in the adjoining sea, bounded as follows: (description inserted) agreeable with the existing laws respecting the rights of piscary.' Or, as in at least one case, as follows: 'The sea in this land said to belong to him, cannot be awarded the same as real land, but (the awardee) can select one species of fish in this sea, according to law, and can taboo, not contrary to law.'" Whether, in either instance, the title or boundaries of the fishery for which application was made, were in dispute, does not appear. While it is true that, under the Act creating the land commission, it was required that the decisions of the board be in

---

[74] In the Matter of the Boundaries of Pulehunui, 4 Haw. 239; In re Title of Pa Pelekane, 21 Haw. 175, 186.

[75] See Akeni v. Wong Ka Mau, 5 Haw. 91, 93, cited and applied in Carter v. Hawaii, 200 U. S. 255, 257; Judd v. Kuanalewa, 6 Haw. 329, 333.

accordance with the principles established or the Civil Code of the Kingdom of Hawaii in regard to prescription, occupancy, fixtures, native usages in regard to landed tenures, water privileges and rights of piscary, the rights of women, the rights of absentees, tenancy and subtenancy, primogeniture and rights of adoption,[76] the land commission was without authority to determine the boundaries of private fishing rights, except in such cases as the same incidentally came in question in respect to the ahupuaa or ili for the award of which application has been made.[77] It is further stated in the submission that "also in making its awards the Commission made it a practice not to include specifically rights of way or water rights belonging to the awarded land." The land commission, similarly as in the case of private fisheries, was without jurisdiction to award easements, except as they might incidentally come in question.[78]

Under the laws of Hawaii awards of ahupuaas and ilis could be made by name only and until their boundaries were established officially they afforded no means of identification of the fishery belonging thereto. The number of awards of ahupuaas and ilis awarded by name only, prior to annexation, does not appear. By the Act of June 19, 1852,[79] the board of commissioners to quiet land titles was empowered to grant titles to konohikis of whole ahupuaas or ilis of lands received by them from the King in the division of 1848, awarding said lands by their proper

---

[76] Second Act Kamehameha III, pt. 1, c. VII, art. IV, § VII.

[77] *Akeni* v. *Wong Ka Mau*, 5 Haw. 91; *Carter* v. *Hawaii*, 200 U. S. 255, 257. For an instance of land commission incidentally deciding heirship, see *Kalama* v. *M. Kekuanaoa and John Ii, Guardians of V. Kamamalu*, 2 Haw. 202, 205.

[78] *John C. Jones* v. *John Meek*, 2 Haw. 9, 12.

[79] Haw. Laws 1852, p. 28. See Civil Code 1859, p. 408, cited and construed in *Boundaries of the Ili of Kewalo*, 3 Haw. 9, 16; *Minister Interior* v. *Papaikou Sugar Co.*, 8 Haw. 125, 126.

names, without survey, except where land had to be divided between two konohikis, or between the King and any konohiki, or between the government and the King or any konohiki when the lands were required to be awarded according to survey, at least in their dividing lines. A similar Act was passed August 10, 1854.[80] This power was exercised by the land commission during the remaining period of its existence. It was dissolved and ceased to function on March 31, 1855.[81] By the Act of August 24, 1860,[82] the minister of the interior was also authorized to issue awards to konohikis of ahupuaas and ilis by name only.

By the Act of August 23, 1862,[83] a commission of boundaries was established to continue in office for the period of five years and all owners of ahupuaas and ilis of land within the Kingdom whose lands had not been awarded by the land commissioner, patented or conveyed by deed from the King by boundaries described in such award, patent or deed, were required within four years from the passage of the Act to file with the commissioners of the district in which the land was situated an application to have the boundaries of said land divided and certified to by the commissioners.

By section 10 of the Act, the minister of the interior was prohibited from issuing any patent from and after the passage of the Act, in confirmation of an award made by name by the commissioners to quiet land titles, without the boundaries being defined in such patent according to the decision of the commissioners of boundaries as provided by the Act. This Act was amended from time to

---

[80] Haw. Laws 1854, p. 25, cited and construed in *Kenoa* v. *Meek*, 6 Haw. 63.

[81] *Id.*, p. 21.

[82] Haw. Laws 1860, p. 27, construed in *Kenoa* v. *Meek*, 6 Haw. 63, and in *Territory* v. *Gay*, 26 Haw. 382, 399.

[83] Haw. Laws 1862, p. 27.

time and the term of the continuance of the commission and the time within which owners of ahupuaas and ilis of land coming within the purview of the law might file their applications to have the boundaries of their lands settled were extended[84] until 1894, when the office of commissioner of boundaries became permanent and the time within which owners of ahupuaas and ilis of land might apply to commissioners of boundaries for the settlement of the boundaries of lands that had been previously awarded to them by name only was left open indefinitely.[85] The law subject to modifications, with which we are not concerned, is in existence today.[86] The title of the Act of August 23, 1862, is quoted in the margin.[87] The boundary commissioners were without jurisdiction to settle the boundaries of fisheries.[88] No certificate of any boundary commissioner has been called to our attention which certifies to the boundaries of a private fishing right. Moreover, outside of the patent in the instant case and the patent involved in the *Damon* case, no patents issued upon certificates by the boundary commissioners have been called to our attention that include a description of an appurtenant

---

[84] Haw. Laws 1866, p. 19; Haw. Laws 1868, p. 30; Haw. Laws 1872, c. XXI; Haw. Laws 1874, c. V; Haw. Laws 1880, c. XLIV; Haw. Laws 1888, c. XL; Haw. Laws 1892, c. LII.

[85] Haw. Laws 1894, Act 14. See Civil Laws 1897, §§ 280-292, §§ 293-295.

[86] R. L. H. 1935, §§ 3660-3670, as amended.

[87] "An Act To Provide For the Appointment of Boundary Commissioners. Whereas, The Boundaries of the majority of the ahupuaas and ilis of land in this Kingdom are not defined by authority, and whereas, it is necessary for the interest of the present and future owners of said lands that the boundaries of the same should be settled before the requisite testimony of witnesses shall be lost by reason of death: Therefore—Be it Enacted, By the King, the Nobles and Representatives of the Hawaiian Islands, in Legislative Council assembled." Haw. Laws 1862, p. 27.

[88] *Akeni* v. *Wong Ka Mau*, 5 Haw. 91.

private fishery. It does not appear to what extent kono-hikis, to whom had been issued awards of ahupuaas or ilis by the land commission or the minister of the interior by name only, had, prior to annexation, settled the boundaries of the lands awarded before the appropriate boundary commissioner and secured to be issued to them patents upon such awards containing a description of the land patented by metes and bounds. Of the royal patents that contained a reference to an appurtenant fishing right, the number in which the reference was sufficient to identify the fishery is undisclosed.

But assuming that the boundaries of an ahupuaa or ili theretofore awarded, to which belonged a private fishery, had, prior to annexation, been settled before the boundary commissioners and a patent issued to the awardee describing the land patented by metes and bounds, there is nothing in the agreed statement to show that the shore boundaries of adjacent private fisheries thereby became fixed. Moreover, assuming that the boundaries of an ahupuaa or ili and those of the fishery adjacent thereto were conterminous at the seashore, the settlement of the boundaries of the ahupuaa or ili before a boundary commissioner would operate only to identify the shore boundary of the adjacent fishery. Identification of the remaining boundaries was necessarily referable "to existing facts";[89] no "principles which have been laid down in cases of more or less similar kind"[90] are applicable. There is no showing that the shore boundaries of sea fisheries in all cases were uniformly conterminous with the shore boundaries of the ahupuaa or ili to which they belonged. Moreover, while it is recited in the agreed statement that the ahupuaas and ilis, having adjacent private fisheries, were uniformly located at right angles to the sea, it does

[89] *Carter* v. *Hawaii*, 200 U. S. 255, 256.
[90] *Ibid.*

not appear that the lateral boundaries of sea fisheries were uniformly at right angles to the shore.

Hence, although the official records pertaining to public lands[91] were complete and comprehensive, they furnished no means of identification of the boundaries of fisheries adjacent to an ahupuaa or ili further than the boundaries of the fishery and the boundaries of the ahupuaa or ili might be conterminous at the sea.

It also appears by the agreed statement that ample provisions were made by law for the registration and recordation of private documents pertaining to private lands.[92] We fail to appreciate the pertinency of the registration and recording of private documents in the absence of any showing that in such records reposed official information of the boundaries of private fisheries.

It is set forth in the agreed statement: "In 1878 a map of the Island of Kauai was completed by the Survey Office which showed, among other things, the location on

---

[91] Resolution of Privy Council dated December 14, 1847. (4 Privy Council Records, 284), requiring: Register of lands belonging to Kamehameha III, the same to be deposited with the registry of land titles in the office of the minister of the interior; also register of lands belonging to the Hawaiian government; Act of April 27, 1846 (Second Act Kamehameha III, pt. 1, c. VII, § 1; art. 1, §§ III, IX, X; art. II, §§ I, V, VI, XII, XIII; art. III; art. IV, §§ VI, XI), requiring records of (a) cession of private lands to the government; (b) disposition of government lands; (c) the real rents, forfeitures and escheats to government and (d) the proceedings of the board of commissioners to quiet land titles. Act of October 26, 1846 (L. 1847, p. 81), legalizing principles adopted by land commission; Act of June 7, 1848 (L. 1848, p. 22), ratifying deeds of Kamehameha III, setting apart to the government certain lands retained by him under the mahele and reserving remainder to himself; Act of June 19, 1852 (L. 1852, p. 28), permitting land commission to issue awards to konohikis by name only; Act of January 3, 1865 (L. 1864, p. 69), making crown lands inalienable.

[92] Act of April 27, 1846 (Second Act Kamehameha III, pt. V, c. II), establishing registry of conveyances for the recordation of private documents.

the sea of every private Konohiki land except a small Ahupuaa known as Haena, belonging to a chief named Paki, and the shore boundaries of this Ahupuaa were between the Ahupuaas of Wainiha and Napali, both of which had had their shore boundaries surveyed prior to 1878." "In 1877-1878 the Island of Lanai was surveyed, and a map thereof made, showing the shore frontages of all the Ahupuaas." "Between the years 1885 and 1895 a complete survey and series of maps of the Island of Molokai were made, also showing the shore boundaries of every Ahupuaa." "By 1890 the Island of Hawaii had been surveyed, and survey maps of that Island made similar to those of the other islands." "By 1890 the area of the entire group had been well and substantially elaborated on paper." It is further admitted in the agreed statement, however, that "Except in cases where fisheries were included by metes and bounds in the Land Commission Awards of the Ahupuaas, these surveys did not purport to show the boundaries of the fisheries." These official maps afforded no further means of identification of the boundaries of fisheries adjacent to ahupuaas and ilis than the official records of public documents.

At the time the Islands were annexed to the United States, it could not be said with any degree of assurance how many private fisheries existed in the Territory. It does not appear how many private fisheries existed by ancient regulation or what was their number in June, 1839. According to the agreed statement, the number of existing private sea fisheries in the year 1900 is inferred from the number of ahupuaas and ilis which have sea frontages. Of the private fisheries that existed at the time of annexation, the number that could be identified from official records does not appear. No attempt has been made to explain the disparity in the number of ahupuaas and ilis having sea frontages and the number of

fisheries established pursuant to the provisions of section 96 of the Hawaiian Organic Act. There is no showing that the disparity in the number of existing fisheries and those established resulted solely from abandonment or failure of establishment, except in the cases of those fisheries which, according to the agreed statement, the trustees themselves failed to establish, nor does it appear that the excess over the number of private fisheries established did not represent alleged private fisheries that were simply non-existent under ancient regulation.

The existence in the instant case of a description of the fishery of Makalawena does not, in our opinion, affect the question of whether the conditions obtaining in Hawaii prior to annexation in respect to the official records of boundaries of sea fisheries made the procedure adopted by section 96 of the Hawaiian Organic Act for their establishment reasonably necessary.

It is true that the royal patent granted by the King to Akahi contained a reference to a sea fishery.[93] And while counsel for the trustees and tenants concede that a patent is only a quitclaim of the government's interest in the commutation,[94] they contend that the patent constituted a grant of the fishery therein referred to under the authority of *Damon* v. *Hawaii*, 194 U. S. 154. The Territory, on the other hand, contends that the alleged grant of the fishery of Makalawena contained in the royal

---

[93] "The *fishing rights* belonging to this land extend one mile out to sea from the shore line, and are bounded on either side as follows: On the South by a line starting from the Southern boundary at sea and running N. 57° 00′ W (true). On the North by a line starting from the Northern boundary at sea and running N. 50° 00′ W. (true)."

[94] See *J. H. Brunz* v. *the Minister of the Interior*, 3 Haw. 783; *E. K. Laanui* v. *Emelia Puohu and George Carsley*, 2 Haw. 161; *Greenwell* v. *Paris*, 6 Haw. 315; *Minister Interior* v. *Papaikou Sugar Co.*, 8 Haw. 125; *Mist* v. *Kawelo*, 11 Haw. 587, 589; *Ter. of Haw.* v. *Liliuokalani*, 14 Haw. 88, 104.

patent to Akahi is void.   In our opinion, the presence in the royal patent to Akahi of a grant to her of the sea fishery of Makalawena is immaterial to the question of due process further than it constitutes an isolated case of an official description of a private sea fishery included as a part of a "system"[95] in which the boundaries of private fisheries were unidentified.

Nor is it material that at the time of annexation the predecessor trustees of the present trustees, parties hereto, and the tenants of the ahupuaa of Makalawena occupied or were in possession of the fishery of that name. It does not appear that their occupancy or possession was exclusive or was of a character to give actual notice of its boundaries.    The same may be said of other existing private fisheries similarly situated.

No claim is made by any of the parties that it was not within the powers of Congress to repeal the existing laws of the Republic of Hawaii, conferring exclusive fishing rights, provided such repeal did not affect vested rights. Nor is the claim made that the Congress was not authorized for the purpose of making all of the sea fisheries of the Territory free to the citizens of the United States, to empower the Federal Government either directly or through the agency of the Territory to acquire by means of the exercise of the power of eminent domain existing private fisheries included in the sea waters of the Territory.    No claim is made that the two-year period within which petitions for the establishment of private fishing rights were required by section 96 of the Hawaiian Organic Act to be filed in the circuit court is unreasonably short. Similarly as to the three-year period within which, under section 95 of the Act, it was required that all private fishing rights in order to their validity should be established.

[95] *Damon* v. *Hawaii*, 194 U. S. 154, 159.

No claim is made that the local statutes pertaining to eminent domain deny due process as to notice or hearing. The extent to which the United States may delegate to the Territory of Hawaii its power of eminent domain is purely political.

The sole ground advanced for the claim by the trustees and tenants that the provisions of section 96 of , the Hawaiian Organic Act are contrary to the due process clause of the fifth amendment is that said section requires claimants of private vested fishing rights to take the initiative and establish their claims in the manner prescribed by said section, in default of which, under the provisions of section 95 of the Act, the fishery was declared to be invalid.

In our opinion the provisions of section 96 of the Hawaiian Organic Act constitute an enabling Act empowering the Territory of Hawaii, in its capacity as agent of the United States, to exercise, in conjunction with local law pertaining thereto, the power of eminent domain possessed by it and pursuant thereto to acquire by condemnation all private fishing rights within the Territory of Hawaii for the declared purpose of making all fisheries in the sea waters of the Territory free to the citizens of the United States. That no condemnation proceedings have been brought by the attorney general to condemn private rights is beside the question. The procedure prescribed by section 96 of the Hawaiian Organic Act must be considered as a whole. The provisions of the section requiring establishment of private fishing rights and those authorizing their acquisition by condemnation are not "independent or unrelated, but parts of a single statutory proceeding" in eminent domain, the initial step of which was the establishment of private fisheries before an appropriate tribunal, followed by condemnation making just compensation when lawfully ascertained. We agree with

counsel for the trustees and tenants that section 95 is not a statute of limitations and not analogous to such a statute. But we disagree with them that it is not in the nature of a recording Act nor in anywise analogous to it in view of the conditions existing in Hawaii at the time of annexation in respect to private fisheries. On the contrary, it was a special statutory proceeding engrafted upon and made a part of the condemnation proceeding authorized by section 96 of the Hawaiian Organic Act, designed to secure the information which the official records lacked and thus "pave the way" for the final condemnation proceedings to follow. The requirement of the establishment of a private fishing right resolves itself under the statute into a judicial determination of a mere claim of right as between the claimant and the United States. It is not an "action" as that term is ordinarily understood. It is designed to settle as between claimants and the United States the ownership and identity of private sea fisheries. It is true that the section itself requires that the "case shall be conducted as an ordinary action at law" and Mr. Justice Holmes, in the *Damon* case, characterizes it as "somewhat like a bill to quiet title."[96] By the provision that "the case shall be conducted as an ordinary action at law" the petition to be filed was oriented as to the type of the case and the procedure locally applicable. Except as to the Territory, a claim to establish a private fishing right possesses none of the incidents of an ordinary action at law and none of the incidents of an action to quiet title at law, except as it may involve title and identity of the sea fishery claimed against the Territory.

As a special statutory proceeding, its incidents are necessarily limited by the right asserted and the party

---

[96] *Damon* v. *Hawaii*, 194 U. S. 154, 157.

against whom the same is prosecuted. No controversial issues with persons other than the Territory are involved. The proceeding is a simple one and imposes no undue burden upon claimants to private fishing rights.

The order which the different steps in legal proceedings may take is unimportant provided they are consonant with the meaning and concepts of due process. Ordinarily proceedings in condemnation are initiated by the condemnor. The then existing local statutes so provided. But where, as here, no official records existed containing a description of the property to be condemned and the information necessary to describe the same was in the possession of those who claimed vested rights therein adverse to the condemnor, it was reasonable to require the persons claiming such interests to establish the same as against the condemnor. It was necessary for the Territory to secure, in advance, descriptions of private fisheries, the rights to which it might thereafter seek to condemn, in order that it could comply with the provisions of the local law pertaining to eminent domain, in respect to the complaint which required it to contain a description of the fishery sought to be condemned, together with an accompanying map correctly delineating the same and its location[97] and so that all of the proper parties claiming vested interests therein could be cited.

We deem it unnecessary to decide whether, under the provisions of law of the Republic of Hawaii pertaining to eminent domain,[98] private fisheries were subject to condemnation or whether they were "real estate" or "appurtenances thereto" within the meaning of section 3 of the Act. If private fisheries are not included in the purposes enumerated in section 1 of the Act, that section was

---

[97] Haw. Laws 1896, Act 45, § 8.
[98] *Id.* Act 45.

impliedly amended by the provisions of section 96 of the Hawaiian Organic Act to include private fisheries. And if private fisheries are not "real estate" or "appurtenances thereunto belonging," as those terms are employed in section 3 of the Act, the Act was impliedly amended by the same section of the Organic Act to include private fishing rights.

Moreover, in the absence of official records of the boundaries of private fisheries, but for the isolated exceptions heretofore noted, proof of boundaries depended upon the facts. The persons best qualified to testify as to the facts were those who by use were familiar with their boundaries as established by ancient regulation, i.e., the konohikis and tenants of the respective lands to which the fisheries belonged and who ultimately, in the event of condemnation, would be adverse parties. No suggestion is made by counsel for the trustees and tenants of the availability of independent official information upon which condemnation of private fisheries conformable to the local statutes and to due process might be predicated. We know of none. No specified instance of descriptions of private fisheries contained in awards has been called to our attention. The number of such instances remains undisclosed despite the records of awards in the office of the commissioner of public lands. The same might be said of patents with the exceptions noted. Nor do the recitals of the agreed statement admit of the conclusion that descriptions of private fisheries in awards or patents were the rule and not the exception and a negligible exception at that. Loss of evidence of the facts was imminent and the Congress no doubt apprehended that, unless the identity and boundaries were established within a reasonable time, those responsible for their acquisition by condemnation would encounter the same difficulties as previously

experienced in respect to the boundaries of lands which had been awarded by name only.[99]

Other procedure may have been devised. The procedure prescribed may have been improved upon. That was a matter, however, in the sole discretion of the Congress. So long as the procedure adopted bears a true relation to the object to be attained and is fairly and reasonably calculated to afford, to those affected, notice and an opportunity to be heard, according to the accepted methods of judicial procedure, the requirement of the initial establishment of private fisheries constitutes due process.

"Due process" as applied to legal proceedings does not require that the proceedings should be by a particular mode but only that there be a regular course of proceedings in which are present the accepted constitutional safeguards of life, liberty and property.[100] The proceedings to be devised are within the legislative discretion provided they are according to those principles recognized and established for the protection and enforcement of private rights.[101] By "due process" in respect to judicial proceedings is not meant judicial proceedings theretofore employed and accepted as due process. Its meaning cannot be so limited. Otherwise there would be denied to the legislature the power to repeal old laws or enact new ones. As said by Mr. Justice Matthews in *Hurtado* v. *California, supra,* p. 537: "It follows that any legal proceeding enforced by public authority, whether sanctioned by age and custom, or newly devised in the discretion of the legislative power, in furtherance of the general public

---

[99] See *Boundaries of Kahua 2, Hilo,* 20 Haw. 278, 289; *In the Matter of the Boundaries of Pulehunui,* 4 Haw. 239; *Boundaries of Kapoino,* 8 Haw. 1; *Boundaries of Kaohe,* 8 Haw. 455.

[100] *Simon* v. *Craft,* 182 U. S. 427, 437.

[101] *United States* v. *Lee,* 16 Otto 196 (U. S.); *Murray's Lessee et al.* v. *Hoboken Land and Improvement Co.,* 18 How. 272 (U. S.); *Meyers* v. *Shields,* 61 Fed. 713.

good, which regards and preserves these principles of liberty and justice, must be held to be due process of law." Due process may consist of process prescribed by statute and unknown to the common law.[102] The case of *Pacific Live Stock Co.* v. *Oregon Water Bd.*, 241 U. S. 440, is in point. Under the Water Control Act of the State of Oregon there was delegated to the State water board the orderly and equitable distribution of the waters of the State among those entitled to their use, including the power to investigate and determine all rights acquired therein by appropriation or otherwise. The Act required that where one or more users of water from any stream requested it, the board, if finding that conditions justified, set in motion a proceeding looking to the ascertainment and adjudication of all rights to the waters of that stream. Each claimant upon notice was required to present a sworn statement of his claim showing its nature, inception and extent and all of the particulars upon which the same was based. The Act was attacked as repugnant to the due process clause of the fourteenth amendment, upon the ground, among others, that the Act required a claimant to water, the rights to which were under investigation by the water board, to assert and prove his claim before the board under penalty of forfeiting his claim if he refused. Right of appeal from the water board to the courts was preserved to parties aggrieved. The court, in response to the assertion of unconstitutionality, said: "A serious fault in this contention is that it does not recognize the true relation of the proceeding before the board to that before the court. They are not independent or unrelated, but parts of a single statutory proceeding, the earlier stages of which are before the board and the later stages before the court. In notifying claimants, taking state-

---

[102] *Twining* v. *New Jersey*, 211 U. S. 78; *Murray's Lessee et al.* v. *Hoboken Land and Improvement Co.*, 18 How. 272 (U. S.).

ments of claim, receiving evidence and making an advisory report the board merely paves the way for an adjudication by the court of all the rights involved." (p. 451.) A similar situation arose in the case of *Botiller* v. *Dominguez*, 130 U. S. 238. By the Act of Congress of March 3, 1851 (9 Stat. L. 631), every person claiming lands in California from the Spanish or Mexican governments was required, within two years of the date of the Act, to present his claim to a commission, created by the Act to settle titles to lands privately owned within the newly acquired Territory under the treaty with Mexico of Guadaloupe Hidalgo,[103] in default of which the land claimed would be deemed to be part of the public domain of the United States. Rights of appeal from the decisions of the court to the appropriate United States courts were preserved to aggrieved claimants. Objection was made to the constitutionality of the requirement of the Act that the claimant take the initiative and establish his claim before the commission and in default thereof forfeit the same upon the ground that the same was in conflict with the rights of property under the Constitution of the United States so far as it affected titles perfected under Mexico. Mr. Justice Miller, speaking for the court, said: "No doubt could exist, and none whatever would have been suggested, if this statute, instead of requiring the individual claimants to take notice that they were called upon to establish their title and to come forward and do so, had provided that the United States should sue everybody who was found in possession of any land in California at the time the treaty was made, and thus compel him to produce his title, if he had any. Such suits would have been sustained without hesitation, as being legal, constitutional and according to right. What difference can it make, then, that

---

[103] Treaty of Guadaloupe Hidalgo, dated February 2, 1848.

the party who is supposed to possess all the evidences which exist to support his claim is called upon to come before a similar tribunal and establish it by a judicial proceeding? It is beyond question that the latter mode is the more appropriate one to carry out the object intended, and better calculated to save time and expense, both to the government and to the party, and to arrive at safe and satisfactory conclusions." (p. 250.)[104]

If further justification for the requirement of the establishment of private fisheries were necessary, it is to be found in the analogy that claims to private fishing rights in the newly acquired Territory of Hawaii bear to claims of private ownership of lands included in the areas ceded to the United States upon the occasion of the purchase from Mexico of upper and lower California and New Mexico. Under this branch of the case, even were we to adopt the theory of counsel for the trustees and tenants that the provisions requiring establishment of private fisheries and the provisions authorizing condemnation included in section 96 of the Hawaiian Organic Act are separable, which they contend is inferable from the dictum in the case of *Damon* v. *Tsutsui*, 31 Haw. 678, 697, the result would be the same. The United States was confronted with the necessity of ascertaining the boundaries of privately owned land included in the ceded territory due to the lack of official surveys and the absence of official records from which the same might be ascertained.[105] "The country, although sparsely populated, was dotted over with land claims. Exact information in regard to their extent * * * could hardly be obtained during the eager search for gold which prevailed soon after we acquired

---

[104] See also *Cage* v. *Trager*, 60 Miss. 563, 568, and cases cited in note 113.

[105] Jones Report, Ex. C, pp. 4, *et seq.*; "Spanish & Mexican Private Grants" by Hon. W. W. Morrow, Ex. D, pp. 18, *et seq.*

California."[106]   Mr. Justice Field refers to the situation thus:[107]  "Previous to the cession numerous grants of land in California had been made by the Spanish and Mexican governments to private parties.  Some of these were of tracts with defined boundaries; some were for specific quantities of land to be selected from areas containing a much larger quantity; and others were of lands known only by particular names, without any designated boundaries."  The existing conditions as to boundaries of lands, included in the ceded territory, claims to which were made after cession to the United States, made the enactment of the Act of Congress of March 3, 1851, *supra*, absolutely necessary.  The Act accomplished the dual purposes of doing justice to individual claimants and of segregating and separating private lands from the public domain.  As said by Mr. Justice Miller:[108]  "It was in this condition * * * with a proprietary title in the United States to a vast region of country included within its limits * * * the necessity was presented for ascertaining by some means the validity of the claims of private individuals within its boundaries, and to establish them as distinct from the lands which belonged to the government."

By the ordinance of June 7, 1839, *supra*, the fishing grounds seaward of the areas reserved as private fisheries, except the fishing grounds seasonably placed under the taboo of the tax officer for the King, became public fishing grounds free to all people.  By the Act of May 24, 1851,[109] if not earlier, the King's taboo was removed and by the same Act all fisheries appurtenant to government lands were made free to the people, subject to the taboos of the minister of the interior.  From the agreed statement it

---

[106] *Newhall* v. *Sanger*, 2 Otto 761, 763 (U. S.).

[107] *More* v. *Steinbach*, 127 U. S. 70, 78.

[108] *Botiller* v. *Dominguez*, 130 U. S. 238, 244.

[109] Haw. Laws 1851, p. 25.

is to be inferred that in 1900 there were 840 government fisheries within the eight larger islands of the Hawaiian group, free to the use of the public. The relative aggregate areas and the respective locations of public and private fisheries do not appear. Public fisheries necessarily, however, adjoined private fisheries and the absence of official records of common boundaries not alone gave rise to confusion, resulting in disputes and controversies, but also admitted of encroachment, either lawful or unlawful, upon the rights of others. The United States, upon the cession of the Hawaiian Islands to it, was confronted with the necessity of promptly securing the preliminary information necessary to the acquisition of existing private fisheries by condemnation. The object was to make all fisheries in the sea waters of the Territory free to the citizens of the United States. The purpose of the requirement of establishment of private fishing rights was to separate the same from the public fisheries for the double purpose of doing justice to the claimants of vested rights therein and protecting the public fisheries from encroachment by adverse claimants and from other acts prejudicial to their free use and enjoyment. To the extent that conditions existing in the newly acquired territory of California justified congressional legislation looking to the segregation of private lands and their separation from the public domain, existing conditions in Hawaii justified congressional legislation necessary to effect the segregation of private fisheries and their separation from the public fisheries, not alone for the purpose of their ultimate condemnation, but for the additional purpose, pending final condemnation, of protecting the public fisheries from encroachment by adverse claimants and from other acts inimical to their free use and enjoyment by the citizens of the United States. As between the conditions existing

674

in Hawaii in respect to boundaries of private fisheries and the conditions existing in California prior to its cession to the United States, the only difference is one of degree. Upon the absence, and not the degree of causation, the reasonableness of legislation depends. And, if reasonable, whether the rights affected are inchoate or complete, it is nonetheless due process.[110]

In the case of *Fremont* v. *United States*, 17 How. 542, 553 (U. S.), in construing the same statute considered in the *Botiller* case (Act of Congress of March 3, 1851, 9 Stat. L. 631), the court said: "It will be seen, from the quotation we have made, that the 8th section embraces not only inchoate or equitable titles, but legal titles also, and requires them all to undergo examination, and to be passed upon by the court. The object of this provision appears to be, to place the titles to land in California upon a stable foundation, and to give the parties who possess them an opportunity of placing them on the records of the country, in a manner and form that will prevent future controversy." In the case of *United States* v. *Fossatt*, 21 How. 445 (U. S.), the language of the *Fremont* case is repeated. In the case of *Newhall* v. *Sanger*, 2 Otto 761 (U. S.), in construing the same statute, it was said: "Claims, whether grounded upon an inchoate or a perfect title, were to be ascertained." Mr. Justice Field, speaking for the court, in *More* v. *Steinbach*, 127 U. S. 70, 81, said: "Assuming that the title under the grant was perfect, the obligation of the grantee was none the less to present his claim to the Board of

---

110 *Fremont* v. *United States*, 17 How. 542, 553 (U. S.); *United States* v. *Fossatt*, 21 How. 445, 447 (U. S.): *Newhall* v. *Sanger*, 2 Otto 761, 764; *More* v. *Steinbach*, 127 U. S. 70, 81: *Botiller* v. *Dominguez*, 130 U. S. 238; *Ainsa* v. *New Mexico & Arizona Railroad*, 175 U. S. 76, 79, 84, 89, 90; *Florida* v. *Furman*, 180 U. S. 402, 435, 438, 439; *Barker* v. *Harvey*, 181 U. S. 481, 491: *United States* v. *Title Ins. Co.*, 265 U. S. 472.

Land Commissioners for examination. The ascertainment of existing claims was a matter of vital importance to the government in the execution of its policy respecting the public lands; and Congress might well declare that a failure to present a claim should be deemed an abandonment of it, and that the lands covered by it should be considered a part of the public domain." In the *Botiller* case, Mr. Justice Miller said: "Nor can it be said that there is anything unjust or oppressive in requiring the owner of a valid claim, in that vast wilderness of lands unclaimed, and unjustly claimed, to present his demand to a tribunal possessing all the elements of judicial functions, with a guarantee of judicial proceedings, so that his title could be established if it was found to be valid, or rejected if it was invalid. We are unable to see any injustice, any want of constitutional power, or any violation of the treaty, in the means by which the United States undertook to separate the lands in which it held the proprietary interest from those which belonged, either equitably or by a strict legal title, to private persons. Every person owning land or other property is at all times liable to be called into a court of justice to contest his title to it. This may be done by another individual, or by the government under which he lives. It is a necessary part of a free government, in which all are equally subject to the laws, that whoever asserts rights or exercises powers over property may be called before the proper tribunals to sustain them." ·

Counsel for the trustees in support of their contention that the word "claim" as used in section 96 of the Hawaiian Organic Act refers to inchoate titles and not to complete titles such as were vested in the trustees to the fishery of Makalawena at the time of the effective date of the Organic Act, cite numerous cases from the United States Supreme Court reports construing Acts of the

Congress of the United States requiring the filing of claims to privately owned lands included in the territory ceded to the United States under the Spanish and French cessions of Florida and Louisiana, respectively, in default of which the claims were considered abandoned and the land a part of the public domain. We shall not attempt to consider each case separately. These cases as a group, however, are readily distinguishable from the later cases decided by the same court in which was construed the later Act of Congress applicable to claims to privately owned land in the territory acquired from Mexico under the treaty of Guadaloupe Hidalgo. The distinction between the two groups is merely a matter of statutory construction. The earlier congressional legislation in respect to claims to privately owned land in Florida and Louisiana definitely referred to claims in which the title was inchoate and not entire and complete. And the United States Supreme Court has so held.[111] But it did not hold in the earlier cases cited by counsel and never has held that entire and complete titles were not subject to similar congressional legislation. On the contrary, as is apparent from the *Fremont, Fossatt, Newhall, Botiller, Ainsa, Furman, Harvey* and *Title Insurance Company* cases, it has expressly held that Congress has the power under the Constitution to require the presentation of perfect titles to a board of land commissioners such as was created under the Act of Congress of March 3, 1851, *supra*, under the penalty of the forfeiture of the land.

The inherent incidents of private fishing rights, the manner and circumstances of their creation, their exclusion from the application of all laws of the Kingdom of Hawaii and its successors, the Provisional Government and Republic of Hawaii, conferring original title to lands, the

---

[111] *United States* v. *Moreno*, 1 Wall. 400 (U. S.) ; *Beard* v. *Federy*, 3 Wall. 478 (U. S.) ; *Fremont* v. *United States*, 17 How. 542 (U. S.).

absence of official records by which their boundaries might be identified, the source of the information of the facts and the declared purpose to make all of the sea waters of the Territory free to the citizens of the United States, are ample justification for the procedure prescribed, both for the segregation and final condemnation of private fishing rights. Upon this branch of the case we conclude that, even though statutory rights to private fisheries in the sea waters of the Territory of Hawaii at the time of annexation of the Hawaiian Islands to the United States were vested rights and the titles of the owners thereof were entire, complete and not inchoate, in the absence of official records of the boundaries of such private fisheries, it was within the power of the Congress of the United States, in accomplishment of its declared purpose to make all sea fisheries in the sea waters of the Territory not included in any fish pond or artificial enclosure free to the citizens of the United States, to provide reasonable means for the segregation and final acquisition of such fishing rights, and the provisions of section 96 of the Hawaiian Organic Act requiring claimants to vested fishing rights, preliminary to the institution by the Territory of condemnation proceedings, to establish their rights in the manner therein provided upon penalty under the provisions of section 95 of the Organic Act, of such rights becoming invalid in case of default, are reasonable and constitute due process.

The trustees and tenants do not claim that sections 95 and 96 of the Hawaiian Organic Act are of themselves, and unexplained or unaffected by the facts, violative of the due process clause of the fifth amendment. Their contention is that, under the facts stated in the agreed submission, they are denied the guarantee of due process. In our opinion, they have wholly failed, upon the facts stated in the agreed statement, to sustain their claim.

This brings us to the consideration of the objection of
the trustees and tenants to the provisions of section 95 of
the Hawaiian Organic Act declaring that no vested right
in private sea fisheries shall be valid after three years
from the taking effect of the Act unless established as
provided by section 96 of the Act upon the ground that
the same are repugnant to the provisions of the fifth
amendment of the Constitution of the United States, pro-
viding that private property shall not be taken for public
use without just compensation. No claim is made that
the taking of a private fishery for the use and benefit of
all of the citizens of the United States is not a public
use nor that the section complained of does not make valid
provision for the payment of compensation when lawfully
ascertained. It is against the penalty imposed by section
95 upon the failure to comply with the provisions of
section 96 and its effect as to compensation that the trus-
tees and tenants complain.

We deem it unnecessary to the determination of the
questions herein considered to decide whether the penalty
imposed by section 95 of the Organic Act applies to default-
ing tenants where the fishery was duly established by the
konohiki pursuant to the provisions of section 96. Where,
as here, it is admitted that the interests of both konohiki
and tenants are vested and both konohiki and tenants
default, the question becomes immaterial.

It is the generally accepted rule that in eminent
domain a landowner may waive his constitutional right to
compensation.[112]

It was optional with the trustees and tenants to waive
compensation for the taking of their respective interests
in the fishery of Makalawena or insist upon compensation
for the taking thereof, in the latter of which event (assum-

---

[112] 20 C. J., tit. Eminent Domain § 299, p. 869; 12 C. J., tit. Con-
stitutional Law § 196, p. 771.

ing but not deciding that the word "person" as used in section 96 of the Organic Act included tenants) it was incumbent upon them to establish such rights in the manner provided by section 96 of the Hawaiian Organic Act. They were bound to know of the provisions of sections 95 and 96 of the Hawaiian Organic Act requiring the establishment of all claims to private fishing rights.

Holding as we do that the establishment of a private fishery is but the preliminary step provided in the proceedings in condemnation authorized by section 96 of the Hawaiian Organic Act, the failure to establish a private fishing right constitutes, in legal effect, a waiver to compensation. The failure of the trustees and tenants to take the necessary proceedings to establish the fishing right of Makalawena was tantamount to a waiver of any compensation to which they might have been entitled upon condemnation.

In considering the question of waiver we were not unmindful of the absence from the agreed statement, of facts upon which waiver, express or implied, might be predicated but conclude that, considering the purposes and objects of the provisions of sections 95 and 96 of the Hawaiian Organic Act, the statutory evidence of waiver must prevail. The legal effect of failing to assert a claim to a private fishing right was not to vest the right in the United States in a proprietary sense but simply to relinquish the fishery subject thereto to the free use and enjoyment of all citizens of the United States—to convert an exclusive private fishing right into a public fishing right, the free use of which might be enjoyed in common by all citizens of the United States, including, if citizens, the trustees and tenants.

A case in point is that of *Reckner, etc.* v. *Warner*, 22 Ohio St. 275. The statute involved provided that "all applications for damages shall be barred, unless they be

presented as provided." The court said: "Do the facts show that the defendant in error waived his right to compensation for the lands appropriated? The defendant in error had full and actual notice, under the statute, of the proceedings by which his property was appropriated, and of the time and place of the view, and he neglected to present his application for compensation to the viewers in writing. He is also chargeable with notice of the provisions of the statute and of the consequences of his neglect to present his claim. It must also be presumed that he knew that the public welfare required the road to be established through his lands. And with knowledge of all these facts, he left his home and the neighborhood of the view on the day preceding the time appointed for the view, without appointing an agent to present his claim or taking other steps to secure his compensation, and did not return until after the report of viewers had been made. Upon this state of facts, we are of opinion that the rule of the statute, as to waiver of compensation on his part, ought to have been applied. It is true that the defendant in error testifies that he did not waive or intend to waive his right to compensation. But we think the statutory evidence of his waiver must prevail, and that under that rule and the circumstances of this case, he is concluded from controverting the legitimate inferences to be drawn from his default in not presenting his claim for damages to the viewers in writing." (p. 295.)

Assuming *arguendo* that the provisions of sections 95 and 96 of the Hawaiian Organic Act apply to all persons claiming vested rights in sea fisheries, including tenants as well as konohikis, in our opinion the failure of the trustees and tenants to establish the fishery of Makalawena in the manner prescribed by section 96 of the Hawaiian Organic Act constituted a waiver of their rights to compensation guaranteed by the fifth amendment.

Our conclusion finds support in the authorities cited in the margin.[113] This opinion has already attained proportions forbidding further quotations.

Considering the establishment of vested fishing rights in private fisheries solely as a provision for the segregation and separation of private fishing rights from public fishing rights, the failure to establish a private fishing right operated as an abandonment and waiver of all claims to and compensation for such fishing right, in the event of which the provision of the fifth amendment of the Constitution, in respect to the taking of property for public use without just compensation, does not apply.[114]

Questions (a) and (c) are answered in the negative; question (b) in the affirmative. A judgment or decree consistent with our conclusions will be entered. upon presentation.

*Smith, Wild, Beebe & Cades* for the trustees and tenants.

*J. V. Hodgson,* Attorney General, and *E. N. Sylva,* Deputy Attorney General, for the Territory.

---

[113] *Pittsburgh* v. *Scott,* 1 Pa. 309, 316 (1845) ; *Lincoln* v. *Colusa County,* 28 Cal. 663, 667 (1865) ; *Dunlap* v. *Pulley,* 28 Iowa 469 (1870) ; *Cupp et al.* v. *Commissioners of Seneca County et al.,* 19 Ohio St. 173, 182 (1869) ; *Potter* v. *Ames,* 43 Cal. 75 (1872) ; *Abbott* v. *The Board of Supervisors of Scott County,* 36 Iowa 354, 356 (1873) : *Shearer* v. *County of Douglas,* 13 Kan. 145 (1874) ; *Simms* v. *Memphis Clarksville & Louisville Railroad Co.,* 12 Heisk. 621, 623 (Tenn. 1874) ; *State* v. *Messenger,* 27 Minn. 119, 6 N. W. 457 (1880) ; *Railroad Company* v. *Defiance,* 52 Ohio St. 262, 304, 305 (1895), affirmed 167 U. S. 88, 193; *Sweet* v. *Rechel,* 159 U. S. 380, 402 (1895) : *Kansas City* v. *Duncan,* 135 Mo. 571, 37 S. W. 513, 515 (1896) ; *Sala* v. *City of Pasadena,* 162 Cal. 714 (1912), 124 Pac. 539; *Witham* v. *Union County,* 202 Iowa 557 (1926), 210 N. W. 535; *Farber* v. *City of Toledo,* 104 Ohio St. 196 (1922), 135 N. E. 533; *Sherer* v. *City of Laguna Beach,* 13 Cal. App. (2d ser.) 396 (1936), 57 Pac. (2d) 157; *Henritzy* v. *Harrison County,* 178 So. 322 (1938).

[114] See cases, *supra,* note 110.